**U S WEST COMMUNICATIONS, INC., a Colorado corporation, Petitioner,**

v.

**CITY OF LONGMONT, a Colorado municipal corporation, Respondent.**

**No. 96SC75.**

Supreme Court of Colorado, En Banc.

Nov. 10, 1997.

Rehearing Denied Dec. 2, 1997.

Otten, Johnson, Robinson, Neff & Ragonetti, P.C., Thomas J. Ragonetti, J. Thomas Macdonald, William H. Brierly, Russell P. Rowe, U S WEST Communications, Inc., Denver, for Petitioners.

Gorsuch Kirgis, L.L.C., Dudley P. Spiller, Maury L. Cujé, Denver, Claybourne M. Douglas, Mickey N. Conrad, Longmont, for Respondents.

Geoffrey T. Wilson, Denver, for Amicus Curiae Colorado Municipal League.

Anderson, Dude, Pifher & Lebel, P.C., Joseph B. Wilson, Colorado Springs, for Amicus Curiae Colorado Association of Municipal Utilities.

Leboeuf Lamb Greene LLP, Mark A. Davidson, Denver, for Amicus Curiae Public Service Company of Colorado.

Denman & Corbetta, P.C., Steven H. Denman, Richard L. Corbetta, Melissa A. Dalla, Denver, for Amicus Curiae West Plains Energy, a Division of UtiliCorp United Inc.

John J. Conway, Berry & Singer, Kent L. Singer, Denver, John L. Kemp, Glenwood Springs, for Amicus Curiae The Colorado Rural Electric Association.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to consider whether the court of appeals erred in *U S West Communications, Inc. v. City of Longmont,* 924 P.2d 1071 (Colo.App.1995), when it affirmed the district court's grant of summary judgment in favor of the City of Longmont (Longmont) in an action brought by U S WEST Communications, Inc. (U S WEST). U S WEST challenged the validity of a Longmont ordinance, which prohibited U S WEST from requiring Longmont to pay for the underground relocation of certain U S WEST telecommunication facilities.[1] The court of

---

1. We granted certiorari on the following issues:
 1. Whether the court of appeals erred when it found that Ordinance 0–93–02 is neither inconsistent with Tariff 4.6 nor preempted under the filed tariff doctrine.

2. Whether the court of appeals erred when it found that the general jurisdiction of the Public Utilities Commission over the facilities, services, rates and charges of U S WEST does not preempt a municipal ordinance requiring U S

appeals upheld the ordinance, rejecting U S WEST's arguments that the ordinance was preempted by the general jurisdiction of the Public Utilities Commission (P.U.C.) and that it conflicted with a tariff U S WEST had filed with the P.U.C. The court of appeals also held that the ordinance did not result in an unconstitutional taking. We uphold the validity of the ordinance, but on different grounds. We affirm the court of appeals' holding that the ordinance was not an unconstitutional taking.

## I.

Longmont is a home rule municipality under article XX, section 6, of the Colorado Constitution and operates its own electric utility department within Longmont's municipal boundaries. Since 1929, Longmont and U S WEST have had a joint use contract, which governs shared use of utility poles and reserves Longmont's right to exercise its municipal police powers. Longmont and U S WEST currently operate approximately ninety-two miles of joint use facilities.

In 1992, Longmont began a plan to relocate certain of its electric main feeder lines underground. In order to realize the benefits of the relocation plan, the Longmont City Council determined that the joint users of the utility poles serving the electric main feeder lines also needed to relocate their facilities underground. Accordingly, on February 9, 1993, the Longmont City Council unanimously approved Ordinance 0–93–02, entitled "Relocation Underground of Overhead Electricity and Communications Facilities" (the Ordinance). The Ordinance, which amended the Longmont Municipal Code, provides in relevant part:

On expiration of the date given in a notice under Section 14.34.050 to relocate underground, it shall be unlawful for any owner or operator to attach, affix, place, install, use, operate or maintain a facility within the street area identified in the notice, unless pursuant to a specific exception un-

der Section 14.34.040, or a written grant of variance in accordance with Section 14.34.070.

. . . .

After giving notice under Section 14.34.050, the city shall attempt to work with the owner or operator of a facility so all may relocate underground in a common trench. The city shall pay for excavation and back fill of a common trench if, within sixty days of mailing of the notice under Section 14.34.050, the owner or operator makes a written commitment, approved by the city attorney and electric director, to relocate its facility in a common trench in a manner that will not delay the relocation of the electric line.

Although failure to comply with the Ordinance is punishable by fine, imprisonment, or both, the Ordinance contains four exceptions, including the option to reroute overhead lines, and provides for the opportunity to request a variance based on extreme technological difficulty or inadequate land development. Regarding relocation costs, the Ordinance provides that a utility shall not require Longmont to pay for underground relocation of a facility not owned by Longmont. The ordinance does not, however, prohibit a facility owner from charging its customers for relocation. Overall, Longmont anticipates reducing by 300 the number of utility poles on Longmont's city streets, alleys, and public ways over a ten-year period.

The Longmont City Council prefaced the Ordinance with a number of findings. Specifically, relocating facilities underground "improves the aesthetics of a community by keeping unsightly poles, lines, and related above ground appurtenances out of the view of the public." Additionally, underground relocation "provides better protection [to the electric facilities] from damage due to accidents with vehicles, inclement weather or other causes" and "makes the facilities less vulnerable to damage from adjacent property maintenance by the citizenry." Under-

WEST to replace, solely at its own cost, its existing overhead facilities with underground facilities.
3. Whether the court of appeals erred when it found that an ordinance requiring the replace-

ment of overhead telephone facilities underground was not a taking under either the United States or Colorado Constitutions.

ground relocation also "better protects the safety of the citizenry of Longmont because of less likelihood of involvement of overhead facilities in vehicular mishaps, and improvement of visibility along public rights of way, which improves the operational safety of roads."

On February 26, 1993, Longmont notified U S WEST of its intent to relocate underground approximately two blocks (1200 feet) of joint use facilities as part of Longmont's civic center expansion plan. The expansion plan called for removal of twenty-three Longmont-owned poles that contained facilities owned by Longmont, U S WEST, and a local cable company. U S WEST did not make a request to reroute the facilities to other above ground locations, nor did it seek a two-year extension as provided in the Ordinance. Rather, U S WEST relocated its facilities underground, incurring approximately $67,000 in relocation costs, and reserved its right to challenge the Ordinance and recover its costs.

In March 1993, U S WEST brought suit in the district court, seeking declaratory, injunctive, and monetary relief. U S WEST challenged the validity of the Ordinance on several grounds. U S WEST claimed, among other things, that both the Exchange & Network Services Tariff Colorado P.U.C. No. 8 § 4.6 (Tariff 4.6)[2] and the general jurisdiction of the P.U.C. preempted the Ordinance. Additionally, U S WEST claimed that the Ordinance as applied resulted in an unconstitutional taking. The district court rejected U S WEST's arguments and granted summary judgment for Longmont.

The court of appeals affirmed the district court's summary judgment ruling. The court of appeals agreed with the district court that the relocation of a utility's facilities located in a public right-of-way is a matter of mixed local and state concern. Relying on our decisions in *City & County of Denver v. State*, 788 P.2d 764, 767–72 (Colo.1990) and *Voss v. Lundvall Bros., Inc.*, 830 P.2d 1061, 1066–69 (Colo.1992), the court of appeals explained that a municipal ordinance can coexist with a state statute so long as the ordinance does not conflict with the statute. The court of appeals treated Tariff 4.6 as a statute and held that it did not conflict with the Ordinance. The court of appeals also held that the general jurisdiction of the P.U.C. did not preempt the Ordinance. Additionally, the court of appeals rejected U S WEST's argument that the Ordinance as applied constituted a taking in violation of the United States and Colorado Constitutions.

## II.

We begin our analysis by considering Longmont's power to pass the Ordinance on the one hand, and the P.U.C.'s power to control the facilities, services, rates, and charges of U S WEST on the other hand. U S WEST argues that the case now before us turns on whether Tariff 4.6 preempts the ordinance promulgated by Longmont as a home rule city. Since U S WEST is a regulated monopoly subject to the jurisdiction of the P.U.C., U S WEST relies on the constitutional status given to utilities regulation under article XXV of the Colorado Constitution. U S WEST argues that, because its tariff is filed with and approved by the P.U.C. pursuant to this grant of constitutional authority, the tariff has the force and effect of state law. Contending that the controversy here is a matter of mixed local and state concern, U S WEST would have us hold that the Ordinance and Tariff 4.6 conflict and that

---

**2.** Tariff 4.6(A)(1) provides:

Where a special type of construction is desired by a customer, such as where underground construction is requested in locations where aerial construction would be regularly used, or where conditions imposed by the customer involved excessive costs, or where underground construction is legally required by ordinance, covenant, tract restriction or otherwise, the customer or customers served by such facilities or the tract developer shall be required to pay the difference between the cost of the under-

ground or other special type of construction and the average cost of construction normally used by the Company.

Tariff 4.6(A)(2) provides:

Where existing aerial facilities are requested to be relocated underground in an area where the Company would not, except for such request, relocate its facilities underground, the Company may charge the cost of such relocation to the persons requesting the relocation of such facilities.

therefore the home rule city's ordinance must yield to state law. We disagree.

## A.

U S WEST urges us to analyze the controversy here as a matter involving mixed local and state concern. In arguing that a mixed local and state concern analysis applies, U S WEST points to our decisions in *People ex rel. Public Utilities Commission v. Mountain States Telephone & Telegraph Co.*, 125 Colo. 167, 178, 243 P.2d 397, 402 (1952), where we held that the P.U.C. is the sole agency authorized to regulate the business and rates of telecommunications companies, and *Moffat v. City & County of Denver*, 57 Colo. 473, 477–78, 143 P. 577, 578–79 (1914), where we explained that objects in and under the public right of way have traditionally been recognized as a matter of local concern. Although U S WEST recognizes that the Ordinance regulates objects in and under the public right of way, U S WEST argues that the Ordinance also affects its business and rates in two respects. First, the Ordinance requires it to relocate, which U S WEST asserts is a "service," and, second, the Ordinance dictates that U S WEST cannot charge Longmont for relocation, hence affecting its rates. After grounding its argument in a mixed local and state concern analysis, U S WEST concludes that Tariff 4.6 and the Ordinance conflict and that therefore the Ordinance is invalid.

The court of appeals similarly analyzed the case now before us under the rubric of mixed local and state concern. After concluding that "[c]ases addressing situations involving public utilities and concerns of municipalities have *implicitly* recognized that the matters involved are of mixed state and local concern," *U S West v. Longmont*, 924 P.2d at 1078 (emphasis added), the court of appeals interpreted the tariff as if it were a statute. *See id.* at 1078–80. The court of appeals construed the provision in Tariff 4.6(A)(2) allowing U S WEST to charge the cost of facilities relocation to "persons requesting" the relocation and held that the quoted phrase referred to customers or tract developers as described in Tariff 4.6(A)(1), not to municipalities requiring underground construction pursuant to an ordinance. *See id.* at 1080. In tandem with this determination, the court of appeals generally explained that tariffs regulate the relations between a utility and its customers, not the relations between a utility and a municipality. *See id.* Based on its distinction between customers and municipalities and its interpretation of Tariff 4.6, the court of appeals reasoned that the Ordinance did not conflict with Tariff 4.6 and thus the Ordinance was not preempted. *See id.* We hold that the court of appeals misapplied our prior precedent when it concluded that resolution of the dispute in this case turns on a mixed local and state concern analysis and that Tariff 4.6 had the equivalent status of a statute.

 Our prior precedent upon which the court of appeals relied is summarized in *Denver v. State*, 788 P.2d at 767–72, which examined the ability of home rule cities and the state to legislate in matters involving three general categories: local concern, state concern, or mixed local and state concern. In that case, we explained that in matters of local concern, both home rule cities and the state may legislate, but when a home rule ordinance or charter provision and a state statute conflict, the home rule provision supersedes the conflicting state provision. *See id.* at 767. In matters of statewide concern, the General Assembly may adopt legislation and preempt the power of home rule municipalities to enact conflicting legislation. *See id.* In matters of mixed local and state concern, a home rule municipality's charter or ordinance provision may coexist with a state statute so long as there is no conflict. *See id.* In the event of a conflict, the state statute supersedes the charter or ordinance. *See id.* We observed that although the three categories are not mutually exclusive or factually perfect, several general factors are useful under a totality of circumstances test to determine whether an issue is one of state, local, or mixed local and state concern, including the need for statewide uniformity of regulation, extraterritorial impact, other state interests, and local interests. *See id.* at 768–72.

 In determining that the controversy here was a matter of mixed local and state

concern, the court of appeals relied heavily on our decision in *City & County of Denver v. Mountain States Telephone & Telegraph Co.*, 754 P.2d 1172 (Colo.1988) (*Mountain States*).[3] In *Mountain States*, we considered whether Mountain Bell had to bear the cost of relocating underground facilities it previously installed and was required to remove as a result of a sanitary sewer line project. *See id.* at 1173. There, we observed that "most, but not all jurisdictions hold that utilities must relocate at their own expense when a municipality exercises its authority to repair, regrade, or realign its streets, redevelop an urban area, construct a mass transit system, or install a water and sewer system." *Id.* at 1175 (citations omitted). We further stated:

> In the absence of a contract, franchise agreement, or *statute* to the contrary, we believe the better rule is to require a utility to pay the cost of relocating its facilities from a public street whenever the municipality requires it in the exercise of its police power to protect the public health, safety, or convenience.

*Id.* at 1176 (emphasis added). The court of appeals concluded that our reference to a "statute to the contrary" meant that the resolution of which entity must pay for relocation involved a matter of mixed local and state concern. The court of appeals also implicitly assumed a utility company's tariff filed with the P.U.C. was a statute. Consequently, the court of appeals could uphold the Ordinance under the mixed local and state analysis only if it concluded that the

Ordinance was not contrary to Tariff 4.6. This assumption and the analysis were both in error.

■ First, Tariff 4.6 is not a state statute. Under section 40–3–103, 11 C.R.S. (1997), a utility must file with the P.U.C. a schedule of the rates, tolls, rentals, charges, and classifications the utility collects or enforces, as well as the utility's rules, regulations, contracts, privileges, and facilities that may affect or relate to rates, tolls, rentals, classifications, or services. Unless the P.U.C. issues a suspension order and schedules a hearing to consider the utility's filed tariff, the tariff becomes effective thirty days subsequent to the filing date and required public notice. *See* Rule 41, 4 CCR 723–1, at 79, 82–84 (1993, 1991). The "filed tariff doctrine" prohibits a regulated entity such as U S WEST from charging rates for its services different from the rates filed with the regulatory authority. *See* Rene Sacas, *The Filed Tariff Doctrine: Casualty or Survivor of Deregulation?* 29 Duq. L.Rev. 1, 5 (1990); Kiplyn R. Farmer, Note, *FERC Waiver of the Filed Rate Doctrine: Some Suggested Principles*, 9 Energy L.J. 497, 498 (1988).

In *Shoemaker v. Mountain States Telephone & Telegraph Co.*, 38 Colo.App. 321, 323, 559 P.2d 721, 723 (1976), the court of appeals held that a tariff limiting a utility company's liability to a customer had the effect of law and therefore extinguished the customer's conflicting common law remedies. *See also Denver & Rio Grande W. R.R. Co. v. Marty*, 143 Colo. 496, 499–500, 353 P.2d

---

3. The court of appeals also discussed two other cases in concluding that the matter here is one of mixed local and state concern. In *City of Englewood v. Mountain States Telephone & Telegraph Co.*, 163 Colo. 400, 406–07, 431 P.2d 40, 43 (1967), we observed that a statewide telephone system is a matter of statewide concern, but also explained that the city had the power to regulate utility poles. There, we highlighted the importance of the state's interest in a statewide telephone system in light of the municipality's assertion that, contrary to a state statute, it could terminate a telephone company's operations if the company did not renew its franchise agreement with the city. *See id.* at 405–07, 431 P.2d at 43–44. The controversy here, however, does not involve a franchise agreement, nor does Longmont assert power to prevent U S WEST from providing services to Longmont residents.

Thus, our observations in *Englewood* are inapposite to this case. In *Denver & Rio Grande Western Railroad Co. v. City & County of Denver*, 673 P.2d 354, 355–60 (Colo.1983), we considered Denver's asserted power to construct and appropriate costs for a new railroad viaduct. In determining that the matter involved mixed local and state concerns, we emphasized that the General Assembly had enacted a statute concerning railroad safety, thus infusing the matter with state interests. *See id.* at 358–60. In this case, by contrast and as we discuss *infra*, the General Assembly has specifically provided municipalities with regulatory power over the use of sidewalks, streets, and utility poles. *See* § 31–15–702, 9 C.R.S. (1997). Thus, *Denver & Rio Grande* also does not lead to the conclusion that the controversy here is a mixed local and state concern.

1095, 1096–97 (1960) (holding that the customer could not assert as a defense to the carrier's nonpayment claim that the carrier quoted different rates from those filed with the regulatory agency). Additionally, this court has previously explained that establishing rates through tariffs filed with the P.U.C. is a properly delegated legislative function. *See City & County of Denver v. People ex rel. Public Utils. Comm'n*, 129 Colo. 41, 43–44, 266 P.2d 1105, 1106 (1954).

To explain that rate-making through tariffs is a proper delegation of legislative power and that tariffs are legally binding does not mean, however, that a tariff rises to the level of a statute within the meaning we intended in *Mountain States*. An illustration of a contrary statute would be an express statutory declaration by the General Assembly requiring the municipality to shoulder relocation costs. A contrary tariff, however, does not come within the limited situations to which we referred in *Mountain States* that change the common law and free a utility from its responsibility to pay for relocation.

Second, and more fundamentally, the court of appeals misconstrued our discussion in *Mountain States* of a "statute to the contrary" when the court of appeals applied it in this case to a consideration of a municipal ordinance. In *Mountain States*, we simultaneously considered the municipality's assertion that under the common law, the utility forced to relocate from a public right-of-way as a consequence of reasonable municipal regulation must do so at its own expense and the utility company's assertion that an exception to the common law rule arises when the municipality acts in a proprietary capacity. *See Mountain States*, 754 P.2d at 1173–76. After rejecting the proprietary/government distinction, we upheld the common law rule requiring utilities to pay for facilities relocation. *See id.* at 1176. We noted that the common law rule originated as far back as our decision in *Moffat* and the United States Supreme Court's decision in *New Orleans Gas Light Co. v. Drainage Commission of New Orleans*, 197 U.S. 453, 462, 25 S.Ct. 471, 474, 49 L.Ed. 831 (1905). *See Mountain States*, 754 P.2d at 1173 n. 1, 1176. In upholding the common law rule, however, we

limited its application by explaining that a conflicting contract, franchise agreement, or statute requiring the municipality to pay for relocation would supersede the rule. *See id.* at 1176. Thus, our reference to a contrary statute had nothing to do with the situation now before us (*i.e.*, an alleged conflict between a municipal ordinance and a tariff). Rather, we referred to a contrary statute, contract, or franchise agreement as various means by which a limitation could be placed on the common law rule requiring a utility to pay for relocation.

■ Third, our prior discussions of local concern, state concern, or mixed local and state concern cases were prompted by the necessity to resolve conflicts between the legislative enactments of two separate sovereigns—*i.e.*, home rule ordinances and state legislation. As we explained in *Denver v. State*, Article XX, section 6, of the Colorado Constitution, which granted "home rule" to municipalities operating under its provisions, altered the basic relationship between such municipalities and the General Assembly. *See Denver v. State*, 788 P.2d at 766–67. In effect, the amendment vested home rule municipalities with their own sphere of sovereignty, providing them with "'every power theretofore possessed by the legislature to authorize municipalities to function in local and municipal affairs.'" *Id.* at 767 (quoting *Four–County Metro. Capital Improvement Dist. v. Board of County Comm'rs*, 149 Colo. 284, 289, 369 P.2d 67, 72 (1962))(emphasis in *Four–County Metro.*). The local concern, state concern, or mixed local and state concern analysis arises when courts are called upon to resolve which sovereign entity's express legislative enactment prevails, not when courts consider allegedly conflicting tariffs and municipal ordinances.

We conclude, therefore, that a local concern, state concern, or mixed local and state concern analysis under *Denver v. State* would be appropriate when considering a statute promulgated by the General Assembly and a possibly conflicting municipal charter or ordinance provision. We hold, however, that a local concern, state concern, or mixed local and state concern analysis is not appropriate in a case such as this one involving an alleged

conflict between a filed tariff and a municipal ordinance.

Were we to hold otherwise, a utility company could avoid having to pay relocation costs simply by procuring P.U.C. approval of a tariff that did not contain the type of interpretation problems present here.[4] Indeed, by clearly indicating that a municipality must pay the utility's relocation costs pursuant to any municipal improvement project, the utility could deftly circumvent the court of appeals' ruling in this case. In other words, an obvious response by U S WEST to the court of appeals' holding here is either to amend Tariff 4.6 so that it specifically defines "a person requesting relocation" to include a municipality undertaking a public works improvement project, or simply to provide in the tariff that a municipality must pay for any relocation the municipality requires pursuant to a charter provision or a local ordinance.

 Our conclusion that a local, state, or mixed local state concern analysis does not apply in this case is not altered by the existence of the Colorado Underground Conversion of Utilities Act, sections 29–8–101 to – 142, 12A C.R.S. (1986 & 1996 Supp.). In the Act's express legislative declaration, the General Assembly stated that the Act was meant to assist landowners, cities, towns, counties, and public utilities seeking to convert existing utility facilities to underground locations by means of special improvement district proceedings. *See* § 29–8–102. We agree with the trial court and court of appeals that while the Act provides municipalities with a procedure by which they may accomplish conversion, the Act in no way limits or binds localities to pursuing conversion only in accordance with the Act. *See id.* The General Assembly did not express any intent for the Act to apply in a case such as this where a municipality pursues facilities relocation pur-

suant to a municipal ordinance. *See id.* Moreover, and as we subsequently explain, four years after passing the Act, the General Assembly expressly provided municipalities with the power to regulate the use of utility poles on sidewalks, streets, and other public grounds. *See* § 31–15–702, 9 C.R.S. (1997). This subsequent express legislative provision negates the argument that the Underground Conversion of Utilities Act clothes the controversy here with a state-wide concern. That the General Assembly provided municipalities and other entities with a possible procedure by which to institute a special district for facilities relocation does not elevate this case to one which requires a local, state, or mixed local state concern analysis.

 To summarize, while a local, state, or mixed local state concern analysis is appropriate when comparing a municipal charter provision or ordinance and an arguably conflicting statute passed by the General Assembly, that analysis is not applicable when comparing a municipal charter provision or ordinance and a utility's arguably conflicting filed tariff. Our decision in *Mountain States* does not support the proposition that a tariff requiring the municipality to pay for relocation trumps a contrary municipal charter provision or ordinance. Only when some future contract, franchise agreement, or state statute enacted by the General Assembly specifically provides that the municipality must bear the financial burden of relocating the facilities does the *Mountain States* exception to the general common law rule requiring the utility company to pay for relocation arise.

### B.

 We turn now to a consideration of whether the P.U.C.'s general jurisdiction preempts Longmont's power to pass the Ordinance. We first examine Longmont's pow-

---

**4.** That Tariff 4.6 presented ambiguities is evident from the difference between the district court's and court of appeals' interpretations of the tariff. The district court concluded that U S WEST could not charge Longmont for the relocation costs under Tariff 4.6(A)(2) because Longmont was requiring the relocation, not "requesting" the relocation and because "persons requesting relocation" referred to natural persons only, not

to municipalities. *See U S West v. Longmont,* 924 P.2d at 1080. The court of appeals disagreed, concluding that "persons requesting relocation" referred to customers or tract developers in Tariff 4.6(A)(1), not municipalities. *See id.* Because we conclude that a mixed local and state concern analysis is not appropriate, we need not decide whether the court of appeals correctly interpreted Tariff 4.6.

er to pass the Ordinance under its general police powers. In *Mountain States,* we explained that "the right of a public utility to locate its facilities on or beneath a public right-of-way is impliedly limited by those municipal services which further the health, safety, or welfare of its citizens." *Mountain States,* 754 P.2d at 1176. *See Meadowbrook–Fairview Metro. Dist. v. Board of County Comm'rs,* 910 P.2d 681, 684 (Colo.1996) (following the explanation in *Mountain States* that a municipality may order facility relocation to protect the public health, safety, or convenience). *See also* § 31–15–103, 9 C.R.S. (1997) (granting municipalities power to adopt ordinances "necessary and proper to provide for the safety, preserve the health, promote the prosperity, and improve the morals, order, comfort, and convenience" of the municipality and inhabitants); *City of Leadville v. Rood,* 198 Colo. 328, 330, 600 P.2d 62, 63 (1979) (upholding municipal ordinance's set-back building requirements on the ground that a municipality's police power to enact ordinances which promote the health, welfare, and safety of the people includes enhancement of the aesthetic value of the city); *U.S. Disposal Sys., Inc. v. City of Northglenn,* 193 Colo. 277, 280, 567 P.2d 365, 367 (1977) (explaining that enacting ordinances which promote the health, safety, and welfare of the people is a proper exercise of police power). *See generally* 12 Eugene McQuillin, *The Law of Municipal Corporations* § 34.78 (3d ed.1995 rev. vol.) (explaining that requiring all poles and wires to be removed from the surface where the underground section is in a congested area of a city is a valid exercise of the police power); 6A Eugene McQuillin, *The Law of Municipal Corporations* § 24.15 (3d ed.1997 rev. vol.) (explaining that the modern jurisprudential view of municipal police power includes reasonable legislation designed to promote aesthetic concerns).

Here, Longmont has predicated the Ordinance on a number of findings directed specifically to its citizenry's health, safety, and general welfare. Longmont has determined that relocating facilities underground will improve traffic safety, better protect its electrical lines, and promote a more aesthetic environment. The findings in the Ordinance

derive solid support from the record. From 1990–1993, over 100 automobiles collided with utility poles adjacent to Longmont's streets. In its consideration of the Ordinance, the Longmont City Council evinced a concern for traffic safety. Additionally, Longmont's traffic engineer stated in an affidavit that removal of utility poles in general from Longmont's streets, alleys, and public ways will enhance traffic safety in Longmont. The traffic engineer also inspected utility poles located in the area of the electric main feeder underground relocation plan and determined that certain poles posed special traffic safety hazards. The Longmont City Council also expressed its desire to improve the aesthetic environment of the city. These safety and aesthetic motivations clearly, and independently, fit within Longmont's health, safety, and general welfare concerns and are thus within the purview of Longmont's general police power.

Longmont also has explicit statutory authority to enact the Ordinance. Under section 31–15–702, 9 C.R.S. (1997), the General Assembly expressly provided municipalities with the power to regulate streets, sidewalks, and utility poles. Section 31–15–702 provides in relevant part:

The governing body of each municipality has the power:

(a)(I) To lay out, establish, open, alter, widen, extend, grade, pave, or otherwise improve streets, parks and public grounds . . .;

(II) To regulate . . . the erecting of utility poles . . .;

(III) To regulate the use of sidewalks along the streets and alleys and all structures thereunder . . .;

. . .

(VI) To regulate and prevent the use of streets, parks, and public grounds for signs, signposts, awnings, awning posts, and power and communications poles. . . .

▇ In *Meadowbrook–Fairview,* we examined a statute similar to section 31–15–702. *See Meadowbrook–Fairview,* 910 P.2d at 684. After reviewing section 30–11–107(1)(h), 12A C.R.S. (1986), which provides the county board of commissioners with pow-

er to lay out, alter, or discontinue any road running through the county, we held in *Meadowbrook–Fairview* that the county had the corresponding power to require relocation of utilities as was reasonably necessary to carry out the delegated powers expressly granted to it by the statute. *See id.* at 684. In line with *Meadowbrook–Fairview,* we similarly conclude here that the General Assembly has specifically provided Longmont with power to regulate the use of utility poles on sidewalks, streets, and other public grounds. This regulatory power includes the power to decide, as is reasonably necessary, where utility poles may and may not be located, as well as the power to decide when relocation of utility poles, including underground relocation, is required.

Regarding P.U.C.'s jurisdiction, Article XXV of the Colorado Constitution gives the General Assembly the power to vest jurisdiction over public utilities' facilities, services, rates, and charges with the P.U.C. Article XXV provides, however, that:

> [N]othing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises; and provided, further, that nothing herein shall be construed to apply to municipally owned utilities.

We have previously explained that "[t]his provision establishes that (1) the Commission cannot interfere with towns and cities in the exercise of their police power, and (2) that the Commission has no jurisdiction over municipally owned utilities." *United States Disposal Sys.,* 193 Colo. at 282, 567 P.2d at 368.

Accordingly, while Article XXV provides the P.U.C. with broad power to regulate public utilities, that power is delimited by both Longmont's general police power to regulate the health, safety, and welfare of its citizens and the specific statutory authority provided in section 31–15–702. We hold that the P.U.C.'s power to regulate U S WEST's

facilities, services, rates, and charges does not reach so far as to preempt Longmont's power to regulate the use of its streets, sidewalks, and utility poles and the corresponding power to determine when reasonable relocation of facilities is required.

## C.

■ Having concluded that the Ordinance is not preempted by the P.U.C.'s general jurisdiction, the remaining question is whether or not the Ordinance's provision prohibiting a utility from requiring Longmont to pay for the utility's facility relocation is valid. We hold that it is.

In *Mountain States,* we recognized that a municipality has the right to compel a utility to relocate its facilities at its own costs, limited by the reasonable exercise of its police powers. *See Mountain States,* 754 P.2d at 1176. We held:

> [A] municipality may compel public utilities to relocate their facilities from the public right-of-way at their own cost whenever such relocation is necessitated by the municipality's *reasonable exercise of police power* to regulate the health, safety, or welfare of its citizens.

*Id.* (emphasis added). We expressed a similar limitation in *Meadowbrook–Fairview* when we held that a utility must pay for relocation "whenever the public entity possessing police power over the right-of-way requires such relocation in *the reasonable exercise of its police power* in order to protect the public health, safety, or convenience." *Meadowbrook–Fairview,* 910 P.2d at 684 (emphasis added).

U S WEST would have us limit the rule we announced in *Mountain States* to "incidental and episodic relocations" associated with public improvement projects, such as street widening.[5] U S WEST distinguishes this

---

5. U S WEST also cites the Colorado Underground Conversion of Utilities Act, sections 29–8–101 to –142, 12A C.R.S. (1986 & 1996 Supp.), to argue that conversion of overhead facilities to underground facilities is distinct from incidental relocations. U S WEST posits that by enacting the Act, the legislature meant to distinguish broad-scale conversions from incidental reloca-

tions and that therefore we should limit *Mountain States* to the latter. As previously explained, while the Act expressly gives counties and cities the power to create local improvement districts for allocating conversion costs to property owners, it does not bind municipalities to pursuing conversion only in accordance with the Act. *See* §§ 29–8–104, –105. We therefore reject the ar-

case from *Mountain States* on the ground that Longmont's sole aim here is relocating facilities, whereas the relocation in *Mountain States* occurred as a by-product of a larger public works project (*i.e.,* installation of a new underground sewer line). According to U S WEST, *Mountain States* was not meant to shelter municipalities seeking only to relocate facilities from the obligation to pay for the relocation. We are not persuaded by this distinction.

While it is true that in *Mountain States* the relocation was necessitated by the construction of a sewer line, *see Mountain States,* 754 P.2d at 1172–73, and the relocation in *Meadowbrook–Fairview* stemmed from a road improvement project, *see Meadowbrook–Fairview,* 910 P.2d at 682, in neither case did we seek to limit a utility's responsibility for relocating its facilities at its own expense when the relocation was only incidental to a public improvement project. Rather, we spoke broadly about a municipality's power to require facility relocation when the municipality reasonably determined it necessary under its police power. A municipality's determination of the necessity for relocating facilities pursuant to a public works project such as street widening or sewer line construction is not, in our view, any different from a municipality's determination that facility relocation in itself is necessary. The focus in both situations is the same, *i.e.,* the municipality's assessment that the relocation is required for the public's health, safety, or welfare. Our decisions in *Mountain States* and *Meadowbrook–Fairview* recognized a municipality's power to order facilities relocation, regardless of whether the relocation is a primary or incidental focus, and required only that the municipality exercise its police power in a reasonable manner. *See Mountain States,* 754 P.2d at 1176; *Meadowbrook–Fairview,* 910 P.2d at 684. Indeed, we stressed in *Meadowbrook–Fairview* that it would be " 'chaotic if some one public agency did not have the

right to regulate the various uses that may be made of the highways.' " *Meadowbrook–Fairview,* 910 P.2d at 683 (quoting *Sanitary Dist. No. 1 of Pima County v. State,* 1 Ariz. App. 45, 399 P.2d 179, 184 (1965)). *Cf. Moffat,* 57 Colo. at 478, 143 P. at 579 (recognizing that requiring a municipality to pay for utilities having to relocate due to the municipality's exercise of its regulatory powers over streets would seriously undermine that very power).

In evaluating an ordinance promulgated for the health, safety, and welfare of the public, a reviewing court applies a presumption of reasonableness. *See United States Disposal Sys.,* 193 Colo. at 281, 567 P.2d at 367. An ordinance is reasonable when it fairly relates to the protection of the health, safety, and welfare of the public. *See id.* at 280, 567 P.2d at 367.

Several factors in this case cause us to conclude that the Ordinance is reasonable. First, as discussed above, Longmont made specific findings that the relocation of facilities furthered the health, safety, and welfare of Longmont residents by improving the city's aesthetics, enhancing traffic safety, and better protecting Longmont's electric facilities. Second, the Ordinance provides that Longmont shall make an attempt to work with utilities affected by a relocation project by allowing the utilities to relocate facilities in a common trench excavated and back filled by Longmont. Third, the Ordinance allows for variances when relocation poses extreme technological difficulties or land development potential suggests relocation should be postponed until such development occurs. Fourth, the Ordinance allows a utility to reroute its facilities above ground, rather than relocating the facilities underground, and provides a two year period to do so. Fifth, the Ordinance does not prevent a utility from filing with the P.U.C. a new tariff allocating relocation costs to its customers.[6]

gument that this statute inherently limits the application of *Mountain States* to only incidental relocations.

**6.** At a Longmont City Council hearing in which the Ordinance was considered, a colloquy between the City Council, special counsel to Long-

mont, and counsel for U S WEST indicated that the P.U.C. allowed U S WEST to charge all its customers for U S WEST's rural facilities improvement program, even though the great majority of customers are located in urban areas and received no direct benefit.

To be clear, we do not hold that these factors must be present in order for a municipal ordinance forbidding a utility from charging the municipality for facilities relocation to be reasonable. The determination of reasonableness must be done on a case-by-case basis. Taken together, however, the facts indicate that in this case, Longmont has reasonably exercised both its general police powers to regulate the health, safety, and welfare of its citizenry and the express powers granted by the legislature to regulate its streets, sidewalks, and utility poles.

### III.

U S WEST argues that even if the Ordinance is not preempted by the P.U.C.'s general jurisdiction, the Ordinance constitutes an uncompensated taking of U S WEST's property in violation of the Fifth Amendment of the United States Constitution as applied to the States by operation of the Fourteenth Amendment and the Colorado Constitution, article II, section 15. U S WEST asserts that because U S WEST constructed its above ground facilities in good faith reliance on Longmont's consent and Longmont's Municipal Code, it acquired property rights in the above ground facilities. Although U S WEST concedes that its property rights in the above ground facilities are subject to the common law rule requiring a utility to relocate, U S WEST argues that the Ordinance goes "too far" by requiring conversion to entirely new underground facilities. Additionally, U S WEST reiterates its argument that *Denver v. Mountain States* is not applicable because Tariff 4.6 and the Colorado Underground Conversion of Utilities Act are contrary statutes. Consequently, U S WEST asserts that Longmont must compensate it for any underground relocation Longmont orders pursuant to the Ordinance. We find this argument unpersuasive and agree with the court of appeals that the Ordinance did not constitute an unconstitutional taking.

■ A taking occurs when an entity with the power of eminent domain substantially deprives a property owner of the use and enjoyment of that property. *See City of Northglenn v. Grynberg,* 846 P.2d 175, 178 (Colo.1993) (citing *Lucas v. South Carolina*

*Coastal Council,* 505 U.S. 1003, 1018–19, 112 S.Ct. 2886, 2894–95, 120 L.Ed.2d 798 (1992)). *See also Lipson v. Colorado State Dep't of Highways,* 41 Colo.App. 568, 569, 588 P.2d 390, 391 (1978) (explaining that *de facto* taking requirements are the condemnor's physical entry, a physical ouster of the property owner, a legal interference with the physical use, possession or enjoyment of the property, or a legal interference with the owner's power of disposition of the property). We have frequently stated that a governmental regulation that prohibits all reasonable use of property constitutes a taking within the meaning of article II, section 15, of the Colorado Constitution. *See, e.g., Jafay v. Board of County Comm'rs,* 848 P.2d 892, 900–01 (Colo.1993); *Van Sickle v. Boyes,* 797 P.2d 1267, 1271 (Colo.1990).

Although we have previously explained that a telecommunications company operating within a municipality has the equivalent of a statewide franchise, *see Englewood,* 163 Colo. at 405–06, 431 P.2d at 43; *cf. Poudre Valley Rural Elec. Ass'n, Inc. v. City of Loveland,* 807 P.2d 547, 555 (Colo.1991) (explaining that utility's facilities and right to serve customers under a certificate of public convenience and necessity are property for purposes of the takings clause), we held long ago that a utility operates subject to the municipality's reasonable exercise of its police powers. *See Moffat,* 57 Colo. at 477–78, 143 P. at 578–79 (rejecting water company's argument that municipality's required relocation of water pipes was unconstitutional taking); *City & County of Denver v. Denver & Rio Grande R.R. Co.,* 63 Colo. 574, 579–80, 167 P. 969, 971 (1917)(holding that municipal ordinance requiring removal of train track from public street was reasonable exercise of police power in light of city's growth, increased traffic, and need for a thoroughfare), *aff'd,* 250 U.S. 241, 39 S.Ct. 450, 63 L.Ed. 958 (1919). *See also New Orleans Gaslight,* 197 U.S. at 462, 25 S.Ct. at 474 (explaining that "uncompensated obedience to a regulation enacted for the public safety under the police power of the state [is] not taking property without due compensation").

■ In our view, a utility may not assert a takings claim when the reasonable

exercise of municipal police power requires the utility to relocate its facilities, notwithstanding the utility's asserted property interest in its state franchise or facilities. As we explained *supra*, a court reviewing a municipal action which requires a utility to relocate its facilities must focus on the reasonableness of the action.[7] So long as the municipal action requiring relocation is reasonable, an affected utility company may not raise a takings argument to shield itself from having to pay for the relocation.

We note that our holding is consistent with the position taken by most courts. *See* 4A Julius L. Sackman, *Nichols on Eminent Domain* § 15.04[2], at 15–29 (3d ed.1997 rev. vol.)(stating "the attitude taken by most courts [is that] when public use requires the removal of utilities[,] ... such use is a privilege and no compensation is due the utility company that must move its facilities. Thus, required relocation of a utility cannot form a basis for inverse condemnation."). *See also* 12 McQuillin, *The Law of Municipal Corporations, supra*, § 34.74.10 (explaining that it is a general principle of law that a utility franchise must bear relocation expenses to accommodate a public works project and that such relocation does not constitute a taking which must be compensated under eminent domain law).

Our holding derives additional support from our recent takings jurisprudence. In *State Department of Health v. The Mill*, 887 P.2d 993, 1000 (Colo.1994), we explained that the party's reasonable investment-backed expectation is the determinative factor when analyzing a takings claim by a regulated party on notice of the government's regulatory authority over its property. In *The Mill*, we rejected the mill's claim that the state's condemnation of its land was an unconstitutional taking when the mill was on notice that both the radioactive materials present on the property and the property itself were highly regulated. *See id.* at 1000–01. We also recognized that the regulation of personal property, such as the franchise and facilities here, traditionally has been subject to a higher degree of state control than real property. *See id.* at 1000 n. 4.

■ In this case, we agree with the court of appeals that when U S WEST located its facilities above ground, it was at the risk that Longmont might require relocation in the future commensurate with Longmont's reasonably exercised police powers. First, U S WEST entered the joint use contract with Longmont in 1929 after we announced our 1914 decision in *Moffat*, which clearly rejected a similar takings argument and explained that a utility operates subject to municipal regulations enacted under the municipality's police powers. *See Moffat*, 57 Colo. at 477–78, 143 P. at 578–79. Second, the General Assembly gave cities such as Longmont the statutory authority to regulate its streets more than fifty years prior to the time U S WEST entered into the joint use contract.[8] Third, the joint use contract explicitly provided that Longmont retained its right to exercise lawfully its municipal police powers.

7. Here, too, we reject U S WEST's assertion that a different result is required when facilities relocation is itself the focus of the municipal action, as opposed to an incidental or episodic effect. A municipality may, as Longmont did here, reasonably decide that relocation is necessary in order to promote the public's health, safety, or welfare. The reasonableness of the municipality's exercised police powers does not turn on a distinction between primary versus incidental purpose. We also reject, as we did in our preemption discussion, U S WEST's assertion that the Colorado Underground Conversion of Utilities Act requires a different result. As we explained, the Act simply provides an avenue by which municipalities may pursue underground conversions.

8. Beginning with the First Session of the General Assembly of Colorado, the legislature provided cities with the power to care for, supervise, and control public streets, alleys, public squares, and commons. *See* Colo. Gen. Laws § 2711 (1877). This statutory grant of power remained substantively unchanged for approximately the next one hundred years. *See* Colo. Gen.Stat. § 3374 (1883); Colo.Rev.Stat. § 6577 (1908); Comp. Laws of Colo. § 9055 (1921); Colo. Stat. Ann., Ch. 163, § 98 (1935); § 139–76–2, 6 C.R.S. (1953); § 139–76–2, 7 C.R.S. (1963); § 31–15–102, 12 C.R.S. (1973). In 1975, the General Assembly provided a more thorough description of a municipality's regulatory control over public streets, sidewalks, and utility poles when it recodified the municipal laws. *See* ch. 275, sec. 1, § 31–15–702, 1975 Colo. Sess. Laws 1004, 1113–14. Section 31–15–702 has remained unchanged since its original enactment in 1975. *See* § 31–15–702, 9 C.R.S. (1997).

Because U S WEST was on notice that Longmont could engage in regulation prescribing the very type of facilities relocation required here, U S WEST cannot argue now that the Ordinance interfered with its reasonable investment-backed expectations, and hence, its takings claim also fails on this basis. We accordingly affirm the court of appeals' holding that the Ordinance was not a taking in violation of the U.S. and Colorado Constitutions.

## IV. Conclusion

In summary, we uphold the Ordinance. Like the court of appeals, we reject the proposition that the P.U.C.'s general jurisdiction preempts the Ordinance. The court of appeals' application of a mixed local and state concern analysis to a comparison of the Ordinance and Tariff 4.6, however, was not the appropriate analysis to reach this conclusion. Rather, we conclude that Longmont's general police powers and specific statutory authority to regulate its streets, sidewalks, and utility poles were not preempted by the P.U.C.'s jurisdiction over U S WEST's facilities, services, rates, and charges. In enacting the Ordinance, Longmont exercised its general police and statutory powers reasonably. Thus, the Ordinance is valid.

We affirm the court of appeals' holding that the Ordinance did not result in an unconstitutional taking of U S WEST's property. Accordingly, the judgment of the court of appeals is affirmed.

KOURLIS, J., dissents, and MARTINEZ, J., joins in the dissent.

SCOTT, J., does not participate.

Justice KOURLIS, dissenting:

Because I view the ordinance as intruding upon matters reserved to the jurisdiction and expertise of the Public Utilities Commission (PUC), I respectfully dissent. Tariffs setting utility rates and allocating utility costs have historically been afforded the status of state law. The majority calls that history into question.

A.

The regulation of public utilities is a matter of mixed state and local concern. *U S West Communications, Inc. v. City of Longmont*, 924 P.2d 1071 (Colo.App.1995).

The state-wide component of interest in the regulation of utilities is reflected first in the Colorado Constitution. The Public Utilities Commission has the power, by operation of Article XXV of the Colorado Constitution, to regulate all facilities, services and charges therefor even within home rule cities and home rule towns. The authority includes exclusive jurisdiction over the facilities of a public utility and the location and relocation of those facilities. *Intermountain R.E.A. v. District Court*, 160 Colo. 128, 134, 414 P.2d 911, 914 (1966).

The state-wide nature of utility relocation is further reflected in section 29–8–105, 9 C.R.S. (1997), in which the General Assembly has provided one means by which the undergrounding of overhead facilities may be financed. Certainly this statute is not the exclusive means of paying for undergrounding, but it does clearly reflect the public policy that those who wish to require utility lines to be buried should be the ones to pay for the benefit. The statute also reflects the General Assembly's assumption that the undergrounding of facilities is an issue of sufficient state-wide importance to require some legislative direction.

Added to the state concerns are the local concerns inherent in regulating objects in a public right of way, *see Moffat v. City & County of Denver*, 57 Colo. 473, 477–78, 143 P. 577, 578–79 (1914), thereby creating the mixture of local and state-wide concerns.

As to matters of mixed local and state-wide concern, a local ordinance may coexist with state law only if there is no conflict between the two. If there is a conflict, the local ordinance will be preempted by state law. *See City & County of Denver v. State*, 788 P.2d 764, 767 (Colo.1990); *Denver & Rio Grande W. R.R. Co. v. City & County of Denver*, 673 P.2d 354, 358 (Colo.1983).

### B.

The PUC has specifically dealt with allocation of the costs associated with underground relocation of utilities and has adopted Tariff 4.6 (Tariff). A tariff created through the exercise of properly delegated legislative authority has the force and effect of state law. *See Shoemaker v. Mountain States Tel. & Tel. Co.,* 38 Colo.App. 321, 559 P.2d 721 (1976) (filed tariff has force and effect of state law and extinguishes inconsistent common law remedy); *see also Lee v. Consolidated Edison Co.,* 98 Misc.2d 304, 413 N.Y.S.2d 826, 828 (N.Y.Sup.Ct.1978) ("Once accepted by the [public utilities] Commission, the tariff schedule (including the limitation of liability provision) takes on the force and effect of law and governs every aspect of the utility's rates and practices"); Annotation, *Carrier's Understatement of Charges Where Discrimination is Forbidden,* 88 A.L.R.2d 1377 § 2 (1963) ("It is said that the published tariffs have the same effect as statutory law.").

In Colorado, the interpretation of tariffs as equating to state law arose out of this court's adoption of the "filed rate doctrine." *See Denver & Rio Grande W. R.R. v. Marty,* 143 Colo. 496, 500, 353 P.2d 1095, 1097 (1960). Under this widely accepted doctrine, a filed tariff becomes the law and neither the utility, the customer, nor the courts may change or modify it. *See, e.g., Public Serv. Co. of Colo. v. Public Utils. Comm'n,* 644 P.2d 933, 939 (Colo.1982); *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915).

The filed rate doctrine was originally established to ensure strict adherence to filed rates and to prevent utilities from intentionally misquoting rates to preferred customers who could then enforce a lower rate than the filed tariff. *See Maislin Indus. U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 127–28, 110 S.Ct. 2759, 2766–67, 111 L.Ed.2d 94 (1990). The purpose was to avoid statutorily forbidden discrimination in rates. *See id.* However, the filed rate doctrine is not limited to "rates" per se, and also encompasses

subjects which will directly affect rates. *See Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 966–67, 106 S.Ct. 2349, 2357, 90 L.Ed.2d 943 (1986) (holding that FERC decision on power allocation which directly affects a utility's rates also implicates the filed rate doctrine).

The General Assembly supports this interpretation of tariffs as state law by carefully specifying the manner by which tariffs are to be filed and modified, and prohibiting any deviation therefrom. *See* §§ 40–3–103 to –105, 11 C.R.S. (1997).

The majority recognizes that a filed tariff has the effect of law to the extent that it abrogates conflicting common law (maj. op. at 515–16); however, not to the extent it might abrogate a local ordinance. The majority holds that a local concern, state concern, or mixed local and state concern analysis applies, not when comparing a tariff with a municipal ordinance, but only when resolving which of two sovereign entities' express legislative enactments prevail. This is just such a situation. A filed tariff is the result of properly delegated legislative power directly from the General Assembly and enjoys the same status as any other legislative enactment from that body. To hold otherwise impairs the authority of the General Assembly to delegate legislative power by diluting the force and effect of properly delegated functions. A filed tariff either has the effect of law or it does not. In my view it should and does.[9] Tariff 4.6 was properly adopted and has the force and effect of state law. Hence, the only inquiry in this case is whether the conflicts with Tariff 4.6 and I believe that it does.

### C.

The Tariff provides that the "persons requesting" the replacement of overhead facilities with underground facilities shall be responsible for the costs of relocation. The trial court concluded that Longmont was not requesting, but was requiring relocation by operation of law and found the Tariff not to

---

**9.** Certainly the specter of regional rates set by a municipality is not an acceptable possibility. However, if we abrogate the notion that Tariff

4.6 has the force of state law, we undermine the filed tariff doctrine in a broader sense.

be in conflict with the ordinance for that reason. The court of appeals concluded that Longmont was not a person as the term is used in Tariff 4.6(A)(1). I find both distinctions unpersuasive. Rather, like the Washington Supreme Court in *General Tel. Co. of Northwest v. City of Bothell,* 105 Wash.2d 579, 716 P.2d 879, 881 (1986), I would focus on the intent of the Tariff: namely the allocation of costs associated with the relocation of overhead lines. The Tariff clearly mandates that the costs of relocation are not to be paid by the utility, but rather by the parties benefited by the relocation. In this case, the parties benefited were the City of Longmont and its citizens.

This court has struggled with the proper definition of the term "person" in a host of different contexts. *See, e.g., Regional Transp. Dist. v. Voss,* 890 P.2d 663, 666 (Colo.1995) (examining legislative intent regarding whether a governmental entity is a "person" under the Colorado No Fault Insurance Act); *City & County of Denver v. Board of County Comm'rs,* 782 P.2d 753, 764 (Colo.1989) (considering whether the legislature intended the term "person" in the Land Use Act to include municipalities). The common thread among the cases is an effort by the court to analyze the intent and purpose of the legislation or constitutional provision. Here, there can be no argument but that the intent of the PUC was to protect utilities from wholesale assessment of the costs of relocation of overhead facilities.

### D.

The majority concludes that the precedent of *City & County of Denver v. Mountain States Tel. & Tel. Co.,* 754 P.2d 1172 (Colo. 1988) stands for the proposition that utilities must pay for relocation of facilities when that relocation is required by a municipality unless a contract, franchise agreement or statute requires otherwise. Such a reading, in my view, trespasses upon the constitutional and statutory jurisdiction of the PUC and inappropriately expands the authority of municipal police power.

Longmont's ordinance is principally an effort to make Longmont a more attractive city. Evidence in the record reflects that particular telephone poles in the city present safety concerns. However, the ordinance permits Longmont to require undergrounding of all lines in the city, and there is certainly no indication that all of the city's utility poles present safety hazards.

Choosing to require undergrounding of utilities on a city-wide basis is conceptually very different from requiring undergrounding of utilities on an episodic, site-specific basis. In both *Mountain States* and *Meadowbrook–Fairview Metropolitan District v. Board of County Commissioners,* 910 P.2d 681 (Colo.1996), cited by the majority, the relocation resulted from episodic road improvement or sewer construction. In that context, local government police power rightfully prevails over conflicting state law. The majority cites section 31–15–702, 9 C.R.S. (1997), in which the General Assembly expressly granted municipalities power to regulate the use of utility poles on streets and public grounds. The language of this statute also supports the distinction between episodic exercise of police power and broad policy choices. The statute provides that municipalities may regulate excavations of public streets and grounds for the "laying-out of gas or water mains and pipes, the building and repairing of sewers, tunnels, and drains, and the erecting of utility poles." § 31–15–702(1)(a)(II), 9 C.R.S. (1997). This description of specific powers is consistent with the notion that a municipality's police power may prevail over statewide concerns where particular city projects so require. Here, however, the City of Longmont is not managing a specific project, but rather is implementing a broad policy choice. In my view, neither *Mountain States* nor *Meadowbrook–Fairview* supports the notion that municipalities are free to require relocation of all utilities within their jurisdiction and require the utilities themselves to bear the associated costs.[10]

The General Assembly has provided a method for financing the costs of utility line

---

**10.** One authoritative treatise on the subject notes that a municipality may not usurp the functions of a state public service commission under the guise of police regulation. 12 E. McQuillin, *Municipal Corporations,* § 34.74 at 180. (3d ed.1970).

relocation, pursuant to which those who benefit from the relocation pay the associated costs. The conclusion reached by the majority provides a method of circumventing that legislative direction. For example, if a group of citizens in a municipality believed that their community would benefit from relocation of overhead facilities, that group would need merely to convince their municipality to enact an ordinance to that effect. By that means, they would escape the costs that they would otherwise have to pay for the benefit of the buried lines. I suggest that the General Assembly has provided the appropriate avenue for that same group of citizens through the creation of an improvement district pursuant to which the properties benefiting from the relocation would bear the associated costs.

### E.

The City of Longmont had every right to conclude that the relocation of overhead facilities would be aesthetically preferable. What it did not have the right to do was to require U S West to pay for that choice. If Longmont had been acting within its local police power, and had required relocation purely to accommodate a specific construction project or safety concern, *Mountain States* would govern and U S West would be required to pay the relocation costs. But Longmont's ordinance far exceeds that narrow application. Under the majority's decision today, if every municipality in the State were to pass a similar ordinance, the utility companies would be faced with the exorbitant costs of relocating every overhead line in the State. In Longmont alone, the undergrounding anticipated in Longmont's current five-year plan will cost approximately $450,000. The estimate does not even include other areas of the City in which Longmont could, under the terms of the ordinance, require undergrounding.

Both parties and the court of appeals make passing reference to the means by which U S West will finance these costs. I suggest that state law prohibits public utilities from extending any "facility or privilege except those which are regularly and uniformly extended to all corporations and persons." § 40–3–105(2), 11 C.R.S. (1997). It would therefore be inappropriate to permit rates to be raised state-wide to finance a benefit enjoyed by the City of Longmont for improvements to its community.

Moreover, section 40–3–106 prevents any type of preferential rate-making. *See Mountain States Legal Found. v. Public Utils. Comm'n,* 197 Colo. 56, 59, 590 P.2d 495, 498 (1979). In *Mountain States Legal Foundation,* this court held that the PUC could not charge lower rates to low-income users because the rates would be subsidized by the remaining ratepayers. *See id.* To do so would violate section 40–3–106 which prohibits preferential rates as well as section 40–3–102 which generally forbids rate discrimination. *See Mountain States Legal Found.,* 197 Colo. at 59, 590 P.2d at 498. Requiring ratepayers statewide to subsidize the cost of Longmont's relocation effects a rate discrimination in favor of Longmont citizens. The citizens of Longmont would enjoy a benefit not extended to state-wide ratepayers, but the state-wide ratepayers would be sharing the costs.

Similarly, there is the possibility that less affluent communities could be forced to subsidize their more affluent counterparts. For example, here the City of Longmont was willing to pay for some excavation and trenching costs associated with relocation. Other communities without the resources to front some of the costs necessary to initiate relocation might nonetheless be forced to pay, through rate increases, for their neighbors' projects.

Hence, because I believe that the ordinance reflects a policy choice that should be financed by those who stand to benefit, and because I believe that the ordinance intrudes upon matters reserved to and, in fact, addressed by the PUC, I respectfully dissent.

MARTINEZ, J., joins in this dissent.