**U S WEST COMMUNICATIONS, INC., a Colorado corporation, Plaintiff–Appellant,**

v.

**CITY OF LONGMONT, a Colorado Municipal corporation, Defendant–Appellee.**

No. 94CA1102.

Colorado Court of Appeals, Div. II.

Nov. 16, 1995.

Rehearing Denied Jan. 11, 1996.

Certiorari Granted Oct. 15, 1996.

Otten, Johnson, Robinson, Neff & Ragonetti, Thomas J. Ragonetti, J. Thomas MacDonald, William H. Brierly, Russell P. Rowe, Denver, for Plaintiff–Appellant.

Gorsuch Kirgis L.L.C., Dudley P. Spiller, Joseph B. Wilson, Denver, Claybourne M. Douglas, City Attorney, Mickey Conrad, Assistant City Attorney, Longmont, for Defendant–Appellee.

Geoffrey T. Wilson, Denver, for Amicus Curiae Colorado Municipal League.

Opinion by Judge MARQUEZ.

In this action seeking relief pursuant to C.R.C.P. 106(a)(4) and for declaratory judgment, plaintiff, U S WEST Communications, Inc., appeals from a summary judgment in favor of defendant, City of Longmont, upholding the validity of an ordinance which requires the owners and operators of existing overhead facilities used for distribution of electricity and transmission or distribution of communications to relocate such facilities underground at their own cost. We affirm.

U S WEST is a provider of telephone and telecommunications services to certain businesses and residences in Longmont. It has erected and maintains utility poles and overhead utility lines in many parts of Longmont and is one of the largest owners and operators of overhead utility lines within Longmont.

Longmont is a home rule municipal corporation under Colo. Const. art. XX, § 6, and owns and operates an electric utility serving municipal residents. Motivated by a number of concerns, Longmont embarked upon the "Electric Main Feeder Underground Work Plan" (Plan) which contemplates the relocation underground of certain existing overhead main feeder facilities belonging to the city's electric department. Pursuant to the Plan, Longmont anticipates a net reduction of approximately 300 utility poles from city streets, alleys, and public ways over the next 10 years.

On February 9, 1993, the city council of Longmont voted unanimously to approve Ordinance 0–93–02 (Ordinance) which amended the Longmont Municipal Code by adding a new chapter entitled "Relocation Underground of Overhead Electricity and Communications Facilities."

> The Ordinance provides, in pertinent part: On expiration of the date given in a notice under Section 14.34.050 to relocate underground, it shall be unlawful for any owner or operator to attach, affix, place, install, use, operate or maintain a facility within the street area identified in the notice, unless pursuant to a specific exception under Section 14.34.040, or a written grant of variance in accordance with Section 14.34.070.

> . . . .

> After giving notice under Section 14.34.050, the city shall attempt to work with the owner or operator of a facility so all may relocate underground in a common trench. The city shall pay for excavation and back fill of a common trench if, within sixty days of mailing of the notice under Section 14.34.050, the owner or operator makes a written commitment, approved by the city attorney and electric director, to relocate its facility in a common trench in a manner that will not delay the relocation of the electric utility line.

Finally, the Ordinance provides that "[e]xcept as otherwise provided, this chapter shall not require that the city pay for relocation underground of a facility of an owner or operator."

Violations of the Ordinance are punishable by a fine or by imprisonment or both. Each day a violation continues constitutes a separate offense. The Ordinance also authorizes the city attorney to seek damages or equitable relief.

The Ordinance was premised upon findings that relocation underground of overhead facilities used for distribution of electricity and transmission or distribution of communications "improves the aesthetics of a community by keeping unsightly poles, lines and related above ground appurtenances out of the view of the public"; "provides better protection [to the facilities] from damage due to accidents with vehicles, inclement weather or other causes"; "better protects the safety of the citizenry of Longmont because of less likelihood of involvement of overhead facilities in vehicular mishaps, and improvement of visibility along public rights of way, which improves the operational safety of roads"; "makes [the facilities] less vulnerable to damage from adjacent property maintenance by the citizenry"; and "will facilitate implementation of [certain] goals of the Longmont Area Comprehensive Plan."

In conjunction with the expansion of its civic center, Longmont approved a project to relocate approximately two blocks (1200 feet) of joint use facilities. Twenty-three poles owned by Longmont but containing U S WEST facilities were to be removed. The cost for U S WEST to place those facilities underground would be approximately $67,-000.

Although notified of the project, because of its concern for the possible statewide implications of compliance with an ordinance requiring it to bear the cost of relocation, U S WEST challenged the ordinance. U S WEST neither made a request to reroute the facilities affected by the civic center improvements to above ground locations, nor did it seek a two-year extension of time for use of the existing civic center facilities, as permitted by the Ordinance.

In March 1993, U S WEST brought suit pursuant to C.R.C.P. 106(a)(4) and for declaratory, injunctive, and monetary relief challenging the Ordinance on the grounds, *inter*

*alia,* that it was preempted by Exchange & Network Services Tariff Colorado PUC No. 8 § 4.6 (Tariff 4.6) and by the general jurisdiction of the Public Utilities Commission (PUC) over the facilities, services, rates, and charges of U S WEST, that application of the Ordinance results in an unconstitutional taking of property, that Longmont exceeded its jurisdiction and abused its discretion while acting in a quasi-judicial manner, that Longmont is estopped from applying the ordinance to U S WEST, and that Longmont breached a pole sharing agreement with U S WEST.

The trial court granted summary judgment for Longmont.

## I.

Asserting various grounds, U S WEST seeks a reversal of the summary judgment in favor of Longmont. We conclude that summary judgment was appropriate.

■■■ Summary judgment is a drastic remedy and is never warranted except on a clear showing that there exists no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of establishing the lack of a triable issue, and all doubts as to the existence of such issue must be resolved against the moving party. *Churchey v. Adolph Coors Co.,* 759 P.2d 1336 (Colo.1988).

Here, the trial court determined that there were no genuine issues of material fact and that the parties so agreed. U S WEST does not contend otherwise on appeal.

### A.

U S WEST first contends that the Ordinance is preempted by conflicting provisions of state law, that the matters addressed by the Ordinance are subjects within the authority of the PUC, and that such matters have been dispositively addressed by the PUC in its promulgation of Tariff 4.6. We disagree.

Tariff 4.6(A)(1) provides:

Where a special type of construction is desired by a customer, such as where underground construction is requested in lo-cations where aerial construction would be regularly used, or where conditions imposed by the customer involved excessive costs, or where underground construction is legally required by ordinance, covenant, tract restriction or otherwise, the *customer or customers served by such facilities* or the *tract developer* shall be required to pay the difference between the cost of the underground or other special type of construction and the average cost of construction normally used by the Company. (emphasis added)

In addition, Tariff 4.6(A)(2) provides:

Where *existing* aerial facilities are requested to be relocated underground in an area where the Company would not, except for such request, relocate its facilities underground, the Company may charge the cost of such relocation to the *persons requesting* the relocation of such facilities. (emphasis added)

In determining the respective authority of the General Assembly and home rule municipalities, the Colorado Supreme Court has recognized three broad categories of regulatory matters: (1) matters of local concern; (2) matters of statewide concern; and (3) matters of mixed state and local concern. *Denver v. State,* 788 P.2d 764 (Colo.1990).

■■■ In a matter of a purely local concern, an ordinance of a home rule city supersedes a conflicting state statute, *Voss v. Lundvall Brothers, Inc.,* 830 P.2d 1061 (Colo. 1992), while in matters of statewide concern, the General Assembly may adopt legislation and home rule municipalities are without power to act unless authorized by the constitution or state statute. *Denver v. State, supra.*

■■■ In matters of mixed local and state concern, a home rule municipal ordinance may coexist with a state statute as long as there is no conflict between the ordinance and the statute, but, in the event of a conflict, the state statute supersedes the conflicting provisions of the ordinance. *Voss v. Lundvall Brothers, Inc., supra; see also* Colo. Const. art. XX, § 6.

## 1.

Here, we perceive no error in the trial court's determinations that relocation of a utility's facilities located in a public right-of-way is a matter of mixed local and statewide concern and that, by its very terms, the grant of authority to the PUC by Colo. Const. art. XXV is limited by the power of municipalities to exercise reasonable police powers.

Initially, we note that U S WEST does not contest Longmont's authority to require the underground relocation under a reasonable exercise of its police powers. Rather, it questions whether Longmont can require U S WEST to relocate an entire aerial system at its own expense.

■ Determinations of whether a particular matter is of "local," "state," or "mixed" concern are to be made on an ad hoc basis, taking into consideration the facts of each case, *Denver v. State, supra,* and the following factors: (1) whether there is a need for statewide uniformity of regulation; (2) whether the municipal regulation has an extraterritorial impact; (3) whether the subject matter is one traditionally governed by state or local government; and (4) whether the Colorado Constitution specifically commits the particular matter to state or local regulation. *Voss v. Lundvall Brothers, Inc., supra.*

Colo. Const. art. XXV, adopted in 1954, provides in part:

> [A]ll power to regulate the facilities, service and rates and charges therefor, including facilities and service and rates and charges therefor within home rule cities and home rule towns, of every corporation, individual, or association of individuals, wheresoever situate or operating within the State of Colorado, whether within or without a home rule city or home rule town, as a public utility, as presently or as may hereafter be defined as a public utility by the laws of the State of Colorado, is hereby vested in such agency of the State of Colorado as the General Assembly shall by law designate.
>
> Until such time as the General Assembly may otherwise designate, said authority shall be vested in the Public Utilities Com-

mission of the State of Colorado; *provided however, nothing herein shall affect the power of municipalities to exercise reasonable police and licensing powers, nor their power to grant franchises;* and provided, further, that nothing herein shall be construed to apply to municipally owned utilities. (emphasis added)

Cases addressing situations involving public utilities and concerns of municipalities have implicitly recognized that the matters involved are of mixed state and local concern. This recognition is apparent in *Denver v. Mountain States Telephone & Telegraph Co.,* 754 P.2d 1172, 1176 (Colo.1988), where the court held, in accordance with the common law rule, that: "In the absence of a contract, franchise agreement, or *statute* to the contrary ... a utility [must] pay the cost of relocating its facilities from a public street whenever the municipality requires it in the exercise of its police power to protect the public health, safety, or convenience." (emphasis added) *See also Norfolk Redevelopment & Housing Authority v. Chesapeake & Potomac Telephone Co.,* 464 U.S. 30, 35, 104 S.Ct. 304, 307, 78 L.Ed.2d 29, 34 (1983) ("Under the traditional common-law rule, utilities have been required to bear the entire cost of relocating from a public right-of-way whenever requested to do so by state or local authorities."); *see generally* 12 E. McQuillan, *Law of Municipal Corporations* § 34.74a (3d ed. 1986 rev. vol.).

It is true that the court held, in *Englewood v. Mountain States Telephone & Telegraph Co.,* 163 Colo. 400, 405, 431 P.2d 40, 42 (1967), that a statutory statewide franchise agreement, *see* § 38–5–101, et seq., C.R.S. (1982 Repl.Vol. 16A), permits a utility "not only to maintain its facilities in plaintiff's public ways, but also [grants] the right to construct and operate additional ones therein without obtaining a city franchise." Additionally, the court there stated that a statewide telephone system is also a matter of statewide concern heavily outweighing any possible municipal interest. Nevertheless, the *Englewood* court also stated that the state franchise there at issue was "perfectly consistent with [the] position that the city may require, under its police power, reasonable acts on the part of

anyone using its streets"; and that, for example, it could require "the reasonable regulation of objects which may be placed in its streets and alleys." *Englewood v. Mountain States Telephone & Telegraph Co.,* 163 Colo. at 407, 431 P.2d at 43. *Cf. People ex rel. Public Utilities Commission v. Mountain States Telephone & Telegraph Co.,* 125 Colo. 167, 243 P.2d 397 (1952) (holding, prior to the adoption of Colo. Const. art. XXV, that the PUC was the sole regulatory body empowered to regulate the rates and business of the telephone company and that a home rule municipality had no power to attempt such regulation).

In *Denver & Rio Grande Western R.R. Co. v. Denver,* 673 P.2d 354 (Colo.1983), the supreme court held that the construction and apportionment of costs for a railroad crossing viaduct was a matter of mixed local and statewide concern subject to the preemptive jurisdiction of the PUC. The court expressly rejected the argument that the power to regulate construction of the viaduct was within the municipality's authority; nevertheless, it also held that the construction and apportionment of costs for viaducts was a matter of mixed local and statewide concern.

■ Furthermore, while U S WEST is concerned about possible statewide implications of having to pay the cost of relocation if other municipalities adopt similar legislation, it does not contend that Longmont's ordinance has any extraterritorial impact. And, while U S WEST raises the specter of statewide rate increases to finance the cost of relocation, that possibility does not eliminate Longmont's concern for the reasonable regulation of the location of objects in its streets. Accordingly, we hold, as did the trial court, that the issues surrounding a home rule city's ordinance requiring a utility to relocate its facilities at its own expense involve matters of mixed statewide and local concern. Hence, a home rule municipality is free to pass such an ordinance to the extent it does not conflict with state law.

### 2.

Since the matters addressed by the Ordinance are of mixed local and statewide concern, the issue becomes whether it conflicts with, and thus is preempted by, state law. We conclude that it is not preempted.

### A.

■ U S WEST's first basis for its claim of preemption is an asserted conflict with the tariff provisions promulgated by the PUC. We perceive no such conflict.

■ The PUC has broad authority to regulate public utilities in this state, *Montrose v. Public Utilities Commission,* 629 P.2d 619 (Colo.1981), including the authority to order a utility to bury or relocate its transmission line. *Mountain View Electric Ass'n v. Public Utilities Commission,* 686 P.2d 1336 (Colo.1984).

■ U S WEST tariffs promulgated by the PUC set forth certain rates, terms, and conditions of service. A tariff created through the exercise of properly delegated legislative authority has the force and effect of state law. *See Shoemaker v. Mountain States Telephone & Telegraph Co.,* 38 Colo. App. 321, 559 P.2d 721 (1976). Since U S WEST asserts that Tariff 4.6 was so created, and Longmont does not contest the issue, we assume for purposes of summary judgment that the tariff in question has the force and effect of state law.

■ In view of this assumption, we conclude that standard principles of statutory construction apply to the interpretation of the tariff. Hence, we must give effect to the intent of the legislative body, *i.e.,* the PUC, by looking first at the language of the tariff. Further, its language must be read and considered as a whole, and, when possible, it should be construed to give consistent, harmonious, and sensible effect to all of its parts. In case of ambiguity, a court may also be guided by the consequences of a particular construction. *See Brooke v. Restaurant Services, Inc.,* 906 P.2d 66 (Colo.1995).

■ In addition, the construction of a tariff, like that of a statute, is a question of law, and, as such, we are not wedded to the trial court's interpretation of Tariff 4.6. *See Dunlap v. Colorado Springs Cablevision, Inc.,* 855 P.2d 6 (Colo.App.1992).

While it is clear under Tariff 4.6(A)(1) that the costs of placing new facilities underground must be absorbed by either the customers served by the facility or a tract developer, and that the "persons requesting" shall be responsible for the costs of relocating existing overhead facilities underground, the terms "persons requesting" are not defined.

U S WEST argues that "persons requesting" in Tariff 4.6(A)(2) includes situations like the instant case in which a municipality requires lines to be placed underground pursuant to an ordinance. Longmont, on the other hand, argues that "persons requesting" applies only to situations in which a customer, tract developer, or similar "natural person" requests such relocation underground. The trial court held that Longmont was "requiring," as opposed to "requesting," relocation, and that "persons" meant natural persons, as opposed to municipalities. The trial court concluded that because the Tariff does not apply, there is no conflict with the ordinance. We agree that there is no conflict, but hold that "persons," as used in Tariff 4.6(A)(2), is limited to those parties identified in Tariff 4.6(A)(1), *i.e.*, "customer(s) served by such facilities" or the "tract developer."

U S WEST relies on *General Telephone Co. of Northwest, Inc. v. City of Bothell,* 105 Wash.2d 579, 716 P.2d 879 (1986), in which the Washington Supreme Court held that a municipality came within the purview of a tariff applying to "the owners of real property served along the route of the constructed facility or to *others* requesting such relocation construction." However, the definition of the term "others" was not an issue in that case. Further, the discussion focused on the definition of the term "requesting." Consequently, we do not find that case persuasive.

In our view, Tariff 4.6(A)(1) and (A)(2) must be read together. Tariff 4.6(A)(1) specifically refers to customer(s) served by the facility or the tract developer who presumably develops an area for the use of future customers. It is undisputed that Longmont is neither. Tariff 4.6(A)(2) simply continues without addressing or specifying any other entities. We thus read "persons" in this context to mean customer(s) served by the facilities or the tract developer.

Pursuant to 4 Code Colo. Reg. 723–2–2.36, "[t]ariff means the entire body of rates, tolls, rentals, charges, classifications, maps and rules adopted and filed with the" PUC. "Viewed in a broad way, the utility rate schedule or tariff might be compared with a menu in a restaurant or a price list in a store. It gives each customer official notice what the charge will be if he selects this or that product or service." F. Welch, *Cases & Text on Public Utility Regulation* 519 (rev. ed. 1968).

These definitions lead us to conclude that tariffs regulate the relationship between a utility and its *customers,* rather than its relations to municipalities with whom it has no direct contractual relationship. Such a reading is consistent with the power of municipalities to exercise their police powers. *See Denver v. Mountain States Telephone and Telegraph Co., supra.*

Accordingly, we hold that the terms "persons," as used in Tariff 4.6, does not include Longmont. Therefore, the tariff is not in conflict with the Ordinance and the latter is not preempted.

**B.**

 U S WEST also argues that the Ordinance is preempted by the Colorado Underground Conversion of Utilities Act, § 29–8–101, et seq., C.R.S. (1986 Repl.Vol. 12A). We disagree.

The referenced act provides a "procedure" for the conversion of "existing overhead electric and communication facilities to underground locations by means of improvement district proceedings." Section 29–8–102, C.R.S. (1986 Repl.Vol. 12A). However, U S WEST concedes that the trial court here correctly noted that the statute is not the exclusive means for relocating facilities underground. Hence, we perceive no basis for finding preemption by virtue of this statute.

**II.**

 U S WEST next argues that the application of the Ordinance will result in taking of valuable U S WEST property, in violation of the rights secured to it by the

Fifth and Fourteenth Amendments and Colo. Const. art. II, § 15. We reject this argument.

As previously discussed, our supreme court held in *Englewood, supra,* that the statewide franchise pursuant to which U S WEST is operating does not prevent a municipality, under its police power, from promulgating and enforcing reasonable regulations regarding objects placed in its streets and alleys. In addition, the statute creating U S WEST's statewide franchise provides that "[s]uch lines of telegraph, telephone, electric light, wire or power or pipeline shall be so constructed and maintained as not to construct or hinder the usual travel on such highway." Section 38–5–101, C.R.S. (1982 Repl.Vol. 16A).

■ Moreover, even if we assume that U S WEST's statewide franchise was not expressly limited as such, "[r]ights and privileges arising from contracts with a state are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense and to the same extent as are all contracts and all property, whether owned by natural persons or corporations." *New Orleans Gas Light Co. v. Drainage Commission,* 197 U.S. 453, 460, 25 S.Ct. 471, 473, 49 L.Ed. 831, 834–35 (1905).

Hence, when U S WEST acquired its state franchise to erect, operate, and maintain its facilities in Longmont's public ways, it accepted this right "upon the implied condition that it shall be held subject to the reasonable and necessary exercise of the police power of the state, operating through legislative enactment, or municipal action." *Denver v. Denver & Rio Grande R.R. Co.,* 63 Colo. 574, 578, 167 P. 969, 970 (1917).

Thus, while it is conceded that the franchise U S WEST acquired was property, it was subject to Longmont's reasonable exercise of its police power. *Moffat v. Denver,* 57 Colo. 473, 143 P. 577 (1914). Accordingly, when U S WEST located its facilities above ground, it was at the risk that they might be disturbed at some future time when the municipality might require for a necessary public use that changes in location be made, and whatever right U S WEST acquired was subject to such future regulations concerning the location of its facilities as might be required in the interest of the public health and welfare. *See New Orleans Gas Light Co. v. Drainage Commission, supra.*

Refusing reimbursement for such expenses is not a taking of property for a public use without just compensation. *Moffat v. Denver, supra; see also New Orleans Gas Light Co. v. Drainage Commission, supra,* 197 U.S. at 462, 25 S.Ct. at 474, 49 L.Ed. at 835 ("uncompensated obedience to a regulation enacted for the public safety under the police power of the state [is] not taking property without due compensation").

### III.

■ U S WEST further asserts that, by passing the Ordinance, Longmont repudiated an existing pole sharing agreement between Longmont and itself. We disagree.

Pursuant to either franchise or joint use contract, many utility poles owned by Longmont are occupied by the overhead facilities of other utilities, including U S WEST and Longmont Cable Communications Corporation. On July 1, 1929, Longmont and U S WEST's predecessor in interest, The Mountain States Telephone and Telegraph Company, executed a "Joint Use Contract for Poles" (pole sharing agreement) to "establish joint use of their respective poles when and where joint use shall be of mutual advantage."

The pole sharing agreement provides that "[w]henever a pole owned by the City is used by the Telephone Company, under the terms of this agreement, the Telephone Company is the licensee," and vice versa. However, it also provides that "[e]xcept as herein otherwise expressly provided, each party shall place, maintain, rearrange, transfer and remove its own attachments . . . at its own expense."

In addition, the agreement provides:

No guarantee is given by the owner of permission from property owners, municipalities or others for the use of its poles by the licensee, and if objection is made thereto and the licensee is unable satisfactorily

to adjust the matter within a reasonable time, the owner may at any time upon 60 days notice in writing to the licensee, require the licensee to remove its attachments from the poles involved, and the licensee shall, within 60 days after receipt of said notice, remove its attachments from such poles at its sole expense. Should the licensee fail to remove its attachments as herein provided, the owner may remove them at the licensee's expense without any liability whatever for such removal or the manner of making it, for which expense the licensee shall reimburse the owner on demand.

Finally, the pole sharing agreement provides:

Except as otherwise herein provided, nothing herein shall be taken to enlarge, extend, modify or otherwise affect the rights granted by the City to the Telephone Company or the rights reserved by the City, under the provisions of Ordinance No. 244, entitled An Ordinance granting certain rights to the Mountain States Telephone and Telegraph Company, successors and assigns, in the City of Longmont, State of Colorado....

Ordinance No. 244 granted Mountain States the right to construct, erect, operate, and maintain poles, wires, cables, underground conduits, manholes, and other telephone fixtures necessary or proper for the maintenance and operation of a telephone exchange and lines connected therewith provided, however, that:

all such poles or other fixtures ... shall be placed ... in such a manner as not to interfere with the usual travel on said streets, alleys and public ways.

Ordinance 244 further provides:

The said Company at all times during the life of this franchise *shall be subject to all lawful exercise of the police power by the City,* and to such reasonable regulations as the City may by resolution or ordinance hereafter provide. (emphasis added)

Longmont exercised its right of termination under the pole sharing agreement on February 8, 1993.

By incorporating the relevant portion of Ordinance 244, the pole sharing agreement was expressly made subject to the lawful exercise of Longmont's police power. Accordingly, since such actions on the part of Longmont were contemplated by the pole sharing agreement, the adoption of the Ordinance cannot, as a matter of law, constitute grounds for its repudiation.

## IV.

U S WEST also argues that Longmont is equitably estopped from allocating the costs of relocation underground to U S WEST because it, in good faith, relied to its detriment upon: (1) its initial franchise to operate a telephone system in Longmont, pursuant to Ordinance 244; (2) its current statewide operating rights, pursuant to § 38–5–101; (3) the fact that the aerial system is a permitted use in each of Longmont's zoning districts; and (4) the pole sharing agreement. We find no estoppel here.

In order to support a claim of equitable estoppel, the following elements must be established: the party to be estopped must know the facts and either intend the conduct to be acted upon or so act that the party asserting estoppel must be ignorant of the facts, and the party asserting estoppel must reasonably rely on the other party's conduct with resultant injury. *Committee for Better Health Care v. Meyer,* 830 P.2d 884 (Colo.1992).

The rights granted to U S WEST under its initial franchise, its subsequent state franchise, and the pole sharing agreement were all made expressly subject to Longmont's reasonable exercise of its police power. In addition, the alleged fact that Longmont's zoning code allows overhead facilities to be placed in all districts relevant to this litigation is of little help to U S WEST because the right to erect overhead facilities in public rights-of-way may only be granted by state or local franchise. *See, e.g., People ex rel. Foley v. Stapleton,* 98 Colo. 354, 56 P.2d 931 (1936) (right to conduct business in a manner that permanently occupies and obstructs a public right-of-way can only be granted by franchise).

Hence, U S WEST's estoppel claim must fail because, as a matter of law, its claimed

reliance on these aforementioned facts was not reasonable.

## V.

■ Finally, U S WEST asserts that, contrary to the decision of the trial court, the Ordinance is a quasi-judicial act and that U S WEST is entitled to a determination under C.R.C.P. 106(a)(4) that Longmont exceeded its jurisdiction and abused its discretion. We find no reversible error.

■ The purpose of an action brought under C.R.C.P. 106(a)(4) is to determine if an inferior tribunal, exercising judicial or quasi-judicial functions, has exceeded its jurisdiction or abused its discretion. *Garland v. Board of County Commissioners,* 660 P.2d 20 (Colo.App.1982). Thus, the threshold issue is whether, in enacting the ordinance, the Longmont City Council was acting in a legislative or quasi-judicial capacity. *Landmark Land Co. v. Denver,* 728 P.2d 1281 (Colo. 1986), *appeal dismissed sub nom. Harsh Investment Corp. v. Denver,* 483 U.S. 1001, 107 S.Ct. 3222, 97 L.Ed.2d 729 (1987).

■ The predominant consideration in determining whether a governmental body has exercised a quasi-judicial function is the nature of the decision rendered and the process by which the decision is reached. As stated in *State Farm Mutual Automobile Insurance Co. v. Lakewood,* 788 P.2d 808, 813 (Colo.1990):

Quasi-legislative action is usually reflective of some public policy relating to matters of a permanent or general character, is not normally restricted to identifiable persons or groups, and is usually prospective in nature. Further, quasi-legislative action requires the balancing of questions of judgment and discretion, is of general application, and concerns an area usually governed by legislation.

. . . .

Quasi-judicial action, on the other hand, generally involves a determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing legal standards or policy considerations to past or present facts developed at a hearing conducted for the purpose of resolving the particular interests in question.

. . . .

The existence of a statute or ordinance mandating notice and a hearing is evidence that the governmental decision is to be regarded as quasi-judicial.

Here, both the process by which the decision was reached and the nature of the decision rendered demonstrate that the Longmont City Council exercised a legislative function when it approved the Ordinance. The factors cited by the Council as motivating its approval of the Ordinance, particularly the improvement of the operational safety of roads, illustrate that its decision was reflective of public policy choices relating to matters of a permanent and general character. *Cf. Public Utilities Commission v. Manley,* 99 Colo. 153, 161, 60 P.2d 913, 917 (1936) ("Few matters are of more general concern to the people of the state than the proper construction and maintenance of public highways.").

In addition, the scope of the Ordinance's applicability is not restricted to identifiable persons or groups, but rather, it applies to an open class consisting of "owners and operators" of facilities in Longmont. Thus, despite the fact that it is possible to identify the persons who presently stand to be directly affected by the Ordinance, the composition of the group of "owners and operators" remains subject to change in the future.

Moreover, the Ordinance's application is inherently prospective in that it is inextricably linked with the City's continuing plan to relocate the Longmont Electric Department's main feeder lines underground. Further, the provision of specific exceptions to the Ordinance, the provision of an application procedure for a variance from its express terms, and the requirement that the City must work together with "owners and operators" if a timely request is made, all reflect a balancing of interests involved and, thus, demonstrate that a balancing of questions of judgment and discretion took place during the process that ultimately led to the approval of the Ordinance.

The City Council's approval of the Ordinance did not involve a determination of the rights, duties, or obligations of specific individuals on the basis of the application of presently existing legal standards or policy considerations to present or past facts. Although the City Council gave notice and conducted two hearings to allow U S WEST and other interested parties to express their views concerning the Ordinance, it was not required to do so by statute or preexisting ordinance.

U S WEST argues, based upon §§ 40–3–104; 40–4–101 through 40–4–111; and 40–5–102, C.R.S. (1988 Repl.Vol. 17), that because the Ordinance "purports to determine whether U S WEST can charge for the service of undergrounding," the City Council could approve the Ordinance only after "notice and a hearing and by applying legal criteria to specific facts." We decline U S WEST's invitation to interpret the Ordinance as purporting to determine whether U S WEST can charge for the service of relocating its lines underground and express no opinion as to the legal consequences if it did.

Finally, U S WEST argues that the Ordinance is clearly the type of action contemplated by the Colorado Supreme Court when it stated in *Landmark Land Co. v. Denver, supra*, 728 P.2d at 1285, that "[a] point could be reached where the 'legislation' is so narrow, so directly pointed at certain individuals, and so intertwined with an area that is usually judicial in nature that it would be quasi-judicial in character," despite meeting the criteria for a legislative act. In our view, this Ordinance is prospective in nature, generally applicable to all "owners and operators" of facilities, concerns an area usually governed by legislation, and thus, is not quasi-judicial in nature.

Accordingly, we conclude that the city council was acting in a legislative capacity when it approved the ordinance and that, thus, U S WEST was not entitled to certiorari review pursuant to C.R.C.P. 106(a)(4).

Since the ordinance represents an exercise of Longmont's legislative prerogative, it is to be presumed constitutional until such presumption is overcome by proof beyond a reasonable doubt. *Landmark Land Co. v. Denver, supra*. "The basis of the exercise of the police power is the protection of human life and the protection of public convenience and welfare. Municipal regulations not having a fair relation to these subjects are unreasonable, but when they fairly tend to promote these objects, they are generally sustained." *Denver v. Denver & Rio Grande R.R. Co., supra*, 63 Colo. at 579, 167 P. at 970.

As noted above, in addition to the promotion of public safety, the Ordinance at issue was also adopted to promote aesthetic values. Such protection of aesthetics is a legitimate legislative function. *Landmark Land Co. v. Denver, supra*.

Accordingly, since the adoption of the Ordinance was motivated by valid purposes for the exercise of a municipality's police power (public safety and aesthetics), we hold that the Ordinance requiring U S WEST to relocate its facilities at its own cost is necessitated by a reasonable, and thus constitutionally valid, exercise of Longmont's police power to regulate the health, safety, or welfare of the citizens.

The judgment is affirmed.

PLANK and HUME, JJ. concur.