[No. 40979-4-I. Division One. February 16, 1999.]
NATIONAL UNION INSURANCE COMPANY OF PITTSBURGH, PA., ET AL., *Appellants*, v. PUGET SOUND POWER & LIGHT, *Respondent*.

164

BECKER, J., dissents by separate opinion.

*Michael K. McCormack* of *Hight Green & Yalowitz*, for appellants.

*Peter D. Byrnes, Paul R. Raskin,* and *Ralph E. Cromwell, Jr.,* of *Byrnes & Keller, L.L.P.,* for respondent.

KENNEDY, C.J. — National Union Insurance Company and various other insurers (collectively, National Union), as subrogees of The Boeing Company (Boeing), sued Puget Sound Power & Light (Puget Power), among others, to recover insurance proceeds paid to Boeing for business losses during a windstorm-related electric service interruption. Puget Power moved for summary judgment dismissing it from the lawsuit, contending that its "continuity-of-service" tariff absolves it from liability for any electric service interruption damages that "result from" circumstances beyond its reasonable control—such as windstorms—notwithstanding its possible negligence in failing to utilize available backup equipment to serve its customers while storm damage to regular sources of electricity is being repaired. Alternatively, Puget Power

contended that National Union failed to set forth sufficient facts to raise a genuine issue of material fact for trial regarding its alleged negligence in failing to utilize the backup equipment in order to mitigate losses to its customers during the period before regular power was restored. The trial court granted Puget Power's motion.

We hold that Puget Power's continuity-of-service tariff does not absolve it from liability for negligent failure to utilize available backup equipment in order to provide power to its customers while storm damage to regular sources of power is being repaired. And viewing the evidence admitted by the trial court for purposes of the summary judgment hearing in the light most favorable to National Union, we conclude that Puget Power's unexplained failure to utilize apparently available backup generators to supply Boeing with electric service during the windstorm-related service interruption—the only factual basis upon which National Union seeks reversal of the trial court's summary judgment order—raises a genuine issue of material fact for trial regarding Puget Power's alleged negligence. Accordingly, we reverse and remand for trial on the factual issue of whether Puget Power negligently failed to utilize backup generators to supply Boeing with electric service while the windstorm damage to regular sources of power was being repaired, resulting in damage to Boeing.

## SUBSTANTIVE FACTS

Puget Power entered into a contract with Boeing to provide power and lighting service, subject to the regulatory authority of the Washington Utilities and Transportation Commission (WUTC) and Puget Power's schedules and tariffs on file with the WUTC. On January 20, 1993, the "Inauguration Day Storm" interrupted electric service to over 500,000 utility customers in the Puget Sound area, including Boeing's Renton plant.

Eighteen hours before the windstorm reached the Puget

Sound area, the National Weather Service (NWS) issued a High Wind Watch. And eight hours before the windstorm, NWS issued a High Wind Warning. At the time, Puget Power maintained a backup generator facility, the Shuffleton Steam Plant, immediately adjacent to Boeing's Renton plant. A substation interconnected the Shuffleton plant with the Boeing plant. Although the Shuffleton plant housed two large generators—either of which, when operating, could meet Boeing's Renton plant's electric service needs—Puget Power did not fire up either generator.

## PROCEDURAL HISTORY

Boeing filed a claim with National Union for $4 million in business losses caused by the electric service interruption. Following various adjustments, National Union paid Boeing insurance proceeds of $2,958,631. National Union, as subrogees to Boeing's business interruption losses, then filed a summons and complaint against Puget Power, the City of Seattle, and Snohomish County Public Utility District No. 1 to recover the insurance proceeds paid to Boeing—alleging negligence, breach of contract, breach of implied warranty of fitness for a particular use, and breach of statutory duties.

Puget Power moved for summary judgment dismissing it from the lawsuit, contending that its ''continuity-of-service'' tariff—incorporated by reference into its contract with Boeing—shields it from liability for service interruption damages caused by windstorms:

CONTINUITY OF SERVICE - Electric service is inherently subject to interruption, suspension, curtailment and fluctuation. Neither the Company nor any other person or entity shall have any liability to any Customer or any other person or entity for any interruption, suspension, curtailment, or fluctuation in service or for any loss or damage caused thereby if such interruption, suspension, curtailment, or fluctuation results from any of the following:

 a. Causes beyond the Company's reasonable control

including, but not limited to, fire, flood, drought, winds, acts of the elements[.]

Clerk's Papers at 51-52. Alternatively, Puget Power contended that National Union failed to raise a genuine issue of material fact regarding Puget Power's alleged negligence in failing to fire up the Shuffleton plant, stating: "Although not relevant to this motion which seeks dismissal of the claims asserted herein because of the clear tariff exemption, Puget Power's construction, maintenance, and storm-related practices were, at the time of the Storm, as good as other power providers in the industry." Clerk's Papers at 23.

In response, National Union argued that Puget Power's continuity-of-service tariff does not absolve it from liability for service interruption damages concurrently caused by circumstances beyond its reasonable control and its own negligence in failing to fire up the Shuffleton plant. National Union further argued that Puget Power's failure to utilize the Shuffleton plant to supply Boeing with electric service during the windstorm-related service interruption raises genuine issues of material fact regarding Puget Power's concurrent negligence. Puget Power then filed an affidavit, which the trial court struck based on the affiant's lack of personal knowledge, stating that the Shuffleton plant could not have been used to supply Boeing with electric service during the windstorm-related service interruptions.

After ruling on the parties' respective motions to strike, granting some of them and denying others, the trial court granted Puget Power's motion for summary judgment, dismissing Puget Power from the lawsuit. National Union petitioned the Supreme Court for direct review. The Supreme Court denied National Union's petition and transferred the appeal to this court.

On appeal, National Union continues to contend that Puget Power's continuity-of-service tariff does not absolve Puget Power from liability for service interruption dam-

ages concurrently caused by circumstances beyond its reasonable control and its own negligence. But National Union no longer contends that Puget Power's general maintenance practices raise a genuine issue of material fact for trial. Rather, as National Union clearly states in its reply brief, its only contention on appeal is that Puget Power's unexplained failure to use the Shuffleton plant to supply Boeing with electric service during the windstorm-related power outage raises a genuine issue of material fact regarding Puget Power's alleged concurrent negligence:

> The factual issue in dispute here is whether [Puget Power's] failure to use Shuffleton to the end of avoiding or mitigating Boeing's outage (as well as the outages of other customers) was a negligent breach of common law, contractual and statutory duties. [Puget Power's] general maintenance practices, though perhaps relevant to this issue, are not dispositive and not the basis for the Insurers' claim.

Appellants' Reply Br. at 15. In addition, both parties appeal various aspects of the trial court's rulings on the motions to strike.

## DISCUSSION

I. Does Puget Power's continuity-of-service tariff absolve it from liability for service interruption damages caused by its negligent failure to utilize available backup sources of power to serve its customers while windstorm damage to regular sources of power is being repaired?

As an initial matter, it should be noted that RCW 80.28.050 requires electric utilities to file tariff schedules with the WUTC "showing all rates and charges made, established or enforced, or to be charged or enforced, all forms of contract or agreement, all rules and regulations relating to rates, charges or service, used or to be used, and all general privileges and facilities granted or allowed by such . . . electrical company[.]" "Limitation of liability provisions are an inherent part of the ratemaking process."

*Lee v. Consolidated Edison Co.*, 413 N.Y.S.2d 826, 828 (App. Div. 1978). The WUTC will approve only "just and reasonable" tariffs. RCW 80.28.010(3). "Once a utility's tariff is filed and approved, it has the force and effect of law." *General Tel. Co. v. City of Bothell*, 105 Wn.2d 579, 585, 716 P.2d 879 (1986).

■ ■ Although the parties dispute the proper interpretation of the continuity-of-service tariff, they do not dispute that the tariff was properly filed with and approved by the WUTC. Therefore, for purposes of summary judgment, we will assume that the continuity-of-service tariff has the force and effect of state law. And "[i]n view of this assumption, we conclude that standard principles of statutory construction apply to the interpretation of the tariff." *US West Communications, Inc. v. City of Longmont*, 924 P.2d 1071, 1079 (Colo. Ct. App. 1995), *aff'd*, 948 P.2d 509 (Colo. 1997); *accord State v. McGinty*, 80 Wn. App. 157, 160, 906 P.2d 1006 (1995) (noting that statutory rules of construction "apply equally to administrative rules and regulations").

■ ■ Under standard principles of statutory construction, when legislative language is plain and unambiguous, its meaning must be derived from the words themselves without judicial construction or interpretation. *Welch v. Southland Corp.*, 134 Wn.2d 629, 633, 952 P.2d 162 (1998). But if the legislative language is ambiguous—i.e., susceptible to more than one meaning—the court must resort to rules of construction to ascertain the drafters' intent when they promulgated the language. *Id.* The proper interpretation of a tariff, like the proper interpretation of a statute, is a question of law. *US West*, 924 P.2d at 1079.

In support of its proposed interpretation of the continuity-of-service tariff, Puget Power argues that the plain language of the tariff does not require that the circumstances beyond its reasonable control be the *sole* cause of the service interruption damages to absolve it from liability, but only that the service interruption damages "result from" a cause beyond its reasonable control. And,

according to Puget Power, its proposed interpretation best comports with the WUTC's charge of ensuring the public "safe, adequate, and sufficient utility services at just, fair, reasonable, and sufficient rates." *People's Org. for Wash. Energy Resources v. Utilities & Transp. Comm'n*, 104 Wn.2d 798, 808, 711 P.2d 319 (1985) (citation omitted). That is, Puget Power argues that if it can be held liable for damages every time circumstances beyond its reasonable control interrupt service, legal expenses and preventative maintenance costs could increase utility rates to prohibitively expensive levels.

National Union, on the other hand, argues that the plain language of the tariff does not absolve Puget Power from liability for service interruption damages that result from a cause beyond its reasonable control, but only from service interruption damages solely caused by circumstances beyond its reasonable control. And, according to National Union, Puget Power's interpretation conflicts with RCW 80.04.440, which holds electric companies liable "to the persons or corporations affected thereby for all loss, damage or injury" caused by actions contrary to state law or regulation, and RCW 80.28.010(9), which forbids agreements between utilities and customers that waive protections afforded by RCW 80.28. *See Employco Personnel Servs., Inc. v. City of Seattle*, 117 Wn.2d 606, 614, 817 P.2d 1373 (1991). That is, National Union argues that if Puget Power cannot be held liable for service interruptions concurrently caused by circumstances beyond its reasonable control and its own negligence, Puget Power will be allowed "to escape accountability when perhaps it should be most accountable, during severe weather." Appellants' Br. at 10.

■ Looking only to the plain language of the continuity-of-service tariff, both parties' interpretations seem reasonable. That is, the language could reasonably be interpreted as absolving Puget Power from liability when the service interruption damage "results from" a cause beyond its reasonable control (notwithstanding its concurrent negligence)

or as absolving Puget Power from liability only when circumstances beyond its reasonable control are the sole cause of the service interruption damages. Therefore, the continuity-of-service tariff is ambiguous, and we must resort to standard principles of statutory construction to ascertain the WUTC's intent when it approved the tariff. *Welch*, 134 Wn.2d at 633. In so doing, we wish to emphasize that both parties state the issue more broadly than is necessary to the disposition of this part of the appeal. The Inauguration Day Storm was the obvious cause of the power outage. All that we need to decide is whether the continuity-of-service tariff absolves Puget Power from its alleged negligence in failing to mitigate damages to its customers by firing up the Shuffleton plant in order to provide that alternate source of power to Boeing while storm damage to regular equipment was being repaired.

Both parties cite a number of cases interpreting a wide variety of statutes and regulations to support their respective proposed interpretations of the continuity-of-service tariff. But these cases shed little light on what interpretation the WUTC intended when it approved this particular tariff. Therefore, instead of focusing on these cases, we look to the public utilities statutory and regulatory scheme as a whole to ascertain the WUTC's intent when it approved Puget Power's continuity-of-service tariff. *See, e.g., ITT Rayonier, Inc. v. Dalman*, 122 Wn.2d 801, 807, 863 P.2d 64 (1993) (considering "regulatory and statutory scheme as a whole" to ascertain meaning of Department of Labor and Industries' notice regulation).

RCW 80.28.010(2) requires electric companies to "furnish and supply such service, instrumentalities and facilities as shall be safe, adequate and efficient, and in all respects just and reasonable." RCW 80.28.010(8) requires electric companies to "construct and maintain such facilities in connection with the manufacture and distribution of its product as will be efficient and safe to its employees and the public." To further ensure adequate electric service, the Legislature established the WUTC to regulate electric

companies in the public interest. RCW 80.01.040. Accordingly, the WUTC has stated its mission as "ensuring that safe and reliable service is provided to consumers at reasonable rates." Clerk's Papers at 48.

To permit the WUTC to carry out its mission, the WUTC is authorized to enact necessary rules and regulations. *Tanner Elec. Coop. v. Puget Sound Power & Light Co.*, 128 Wn.2d 656, 666, 911 P.2d 1301 (1996) (quoting RCW 80.01.040(4)). For example, the WUTC requires electric companies to provide adequate service and minimize service interruptions:

> Maintenance—each utility shall maintain its plant and system in such condition as will enable it to furnish adequate service.

> Interruptions of service—each utility shall endeavor to avoid interruptions of service, and, when such interruptions occur, to reestablish service with a minimum of delay.

WAC 480-100-076. If an electric utility violates state law or a WUTC regulation, that utility may held liable "to the persons or corporations affected thereby for all loss, damage or injury caused thereby or resulting therefrom[.]" RCW 80.04.440.

Given this statutory and regulatory scheme as a whole, it seems highly unlikely that the WUTC, when it approved this particular tariff, intended to absolve Puget Power from liability for its own allegedly negligent failure to utilize available backup equipment in order to reestablish service with a minimum of delay while storm damage to regular equipment is being repaired. First, absolving Puget Power of liability for its negligent failure to utilize available backup equipment would be at odds with its statutory duty to provide "adequate and efficient" electric service, RCW 80.28.010, and regulatory duty "to avoid interruptions of service, and, when such interruptions occur, to reestablish service with a minimum of delay." WAC 480--100-076. Second, holding Puget Power liable for its negligent failure to utilize available backup equipment

would permit its customers to exercise their right to recover damages under RCW 80.04.440. *See, e.g., Olson v. Pacific N.W. Bell Tel. Co.*, 65 Or. App. 422, 671 P.2d 1185, 1186 (1983) (holding negligence, gross negligence, and breach of contract claims actionable under statute similar to RCW 80.04.440 for breach of statutory duty to provide adequate telephone service). Third, absolving Puget Power of liability for its negligent failure to utilize available backup equipment would absolve Puget Power of liability that did not truly "result from" circumstances beyond its reasonable control, but rather from its negligent failure to utilize the available backup equipment. Therefore, we hold that Puget Power's continuity-of-service tariff does not absolve it from liability for service interruptions that it could have controlled or mitigated but for its unreasonable or unexplained failure to utilize available backup equipment in order to reestablish service with a minimum of delay while storm damage to regular equipment is being repaired.[1]

---

[1]We respectfully disagree with the dissent's conclusion that National Union should not be given an opportunity to prove that Puget Power negligently failed to utilize a backup power source to provide Boeing's Renton plant with electric service.

First, instead of addressing the language of the continuity-of-service tariff, the dissent concludes that summary judgment was appropriate because "National Union did not establish duty in its response to Puget Power's motion for summary judgment." But Puget Power does not dispute that WAC 480-100-760 requires electric companies "to avoid interruptions of service, and when such interruptions occur, to reestablish service with a minimum of delay." *See* Resp't's Br. at 29-30. Rather, Puget Power contends that its continuity-of-service tariff absolves it from liability for damages resulting from storm-related service interruptions. Indeed, if Puget Power does not have a duty to avoid and promptly remedy storm-related service interruptions, section (a) of the continuity-of-service tariff would be rendered superfluous.

Second, even if the dissent's approach is analytically correct, we do not agree that WAC 480-100-076 should be rewritten to read: "each utility shall endeavor to avoid [scheduled] interruptions of service, and when such [scheduled] interruptions occur, to reestablish service with a minimum of delay." Besides conflicting with the plain language of the regulation, this interpretation conflicts with a later provision of WAC 480-100-076 that requires "all interruptions of service affecting a substantial number of customers" and "the cause of each interruption" to be recorded. Moreover, this interpretation would exclude all unscheduled interruptions, including equipment failures unrelated to natural causes, from regulation

II. Does the economic loss rule bar National Union, as Boeing's subrogee, from recovering service interruption damages under tort law principles?

Puget Power next contends that because Boeing's service contract incorporated by reference the continuity-of-service tariff, the parties contractually allocated the risk from service interruptions. Therefore, Puget Power maintains that the economic loss rule prevents National Union, as Boeing's subrogee, from recovering damages under a tort theory:

> The economic loss rule marks the fundamental boundary between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect citizens and their property by imposing a duty of reasonable care on others. The economic loss rule was developed to prevent disproportionate liability and allow parties to allocate risk by contract. Economic loss is a conceptual device used to classify damages for which a remedy in tort or contract is deemed permissible, but are more properly remediable only in contract. Moreover, "economic loss describes those damages falling on the contract side of 'the line between tort and contract'."

*Berschauer/Phillips Constr. Co. v. Seattle School Dist. No. 1*, 124 Wn.2d 816, 821-22, 881 P.2d 986 (1994) (citations omitted).

■■ As discussed above, the parties do not dispute that the continuity-of-service tariff has the force and effect of state law. And once the tariff took effect, the parties could not negotiate around its terms:

> No gas company, electrical company or water company shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges applicable to such service as specified in

---

under WAC 480-100-076's coverage—a result the WUTC, which is charged with regulating electric companies in the public interest, could not have intended.

Finally, the dissent's statement that "any customer who suffered power loss damage in the Inauguration Day storm could have been a plaintiff along with Boeing" assumes facts not in the record and, in any event, would be true of only those customers whose damages could have been mitigated by firing up the Shuffelton plant.

its schedule filed and in effect at the time, nor shall any such company directly or indirectly refund or remit in any manner or by any device any portion of the rates or charges so specified, or furnish its product at free or reduced rates . . .

No gas company, electrical company or water company shall extend to any person or corporation any form of contract or agreement or any rule or regulation or any privilege or facility except such as are regularly and uniformly extended to all persons and corporations under like circumstances.

RCW 80.28.080. Therefore, the continuity-of-service tariff is not the result of any contractual negotiations between Puget Power and Boeing:

Contract law is designed to enforce the expectancy interests created by agreement between private parties. The law imposes no standards to judge each party's performance; the only standards are those that the parties have agreed upon. As such, contract law seeks to enforce standards of quality as defined in the contract.

Sidney R. Barrett Jr., *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis*, 40 S.C. L. REV. 891, 901 (1989), *cited in Berschauer/Phillips*, 124 Wn.2d at 821-22.

Moreover, National Union's claims against Puget Power are for breaches of statutory and regulatory duties independent of Boeing and Puget Power's contract. Therefore, National Union's claims are better described as sounding in tort:

In contrast, tort law is designed to secure the protection of all citizens from the danger of physical harm to their persons or to their property. Tort standards are imposed by law without reference to any private agreement. They obligate each citizen to exercise reasonable care to avoid foreseeable physical harm to others. As such, tort law primarily is concerned with enforcing standards of conduct.

Sidney R. Barrett Jr., *Recovery of Economic Loss*, 40 S.C. L. REV. at 901-02. And the Legislature specifically authorizes

aggrieved parties to sue electric utilities in tort for violations of state law or WUTC regulations. *See* RCW 80.04.440. Therefore, the economic loss rule does not bar National Union, as Boeing's subrogee, from recovering damages in this case under tort law principles.

III. Did National Union set forth sufficient facts to raise a genuine issue of material fact for trial regarding Puget Power's alleged negligence in failing to fire up the Shuffleton plant, thereby precluding summary judgment?

Puget Power contends that even assuming that it can be held liable for service interruption damages concurrently caused by circumstances beyond its reasonable control and its own negligent failure to utilize available alternate sources of power, National Union failed to set forth sufficient facts to raise a genuine issue of material fact for trial regarding its alleged concurrent negligence.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). Affidavits and declarations supporting and opposing a motion for summary judgment "must be made on personal knowledge, set forth facts that would be admissible in evidence, and show that the affiant is competent to testify on the matter." *Sun Mountain Prods., Inc. v. Pierre*, 84 Wn. App. 608, 616, 929 P.2d 494 (citing CR 56(e)), *review denied*, 132 Wn.2d 1003 (1997).

"A defendant may move for summary judgment by either (1) pointing out the absence of competent evidence to support the plaintiff's case or (2) establishing through affidavits that no genuine issue of material fact exists." *Fisher v. Aldi Tire, Inc.*, 78 Wn. App. 902, 906, 902 P.2d 166 (1995), *review denied*, 128 Wn.2d 1025 (1996). "The plaintiff must then set forth specific facts showing that there is a genuine issue of material fact for trial." *Ernst Home Ctr., Inc. v. United Food & Commercial Workers Int'l*

*Union*, 77 Wn. App. 33, 40, 888 P.2d 1196 (1995) (citing *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225-26, 770 P.2d 182 (1989)). "The motion will be granted, after considering the evidence in the light most favorable to the nonmoving party, only if reasonable persons could reach but one conclusion." *Reynolds v. Hicks*, 134 Wn.2d 491, 495, 951 P.2d 761 (1998). "When reviewing a summary judgment order, an appellate court engages in the same inquiry as the trial court." *Id.*

 ██ Under Washington tort law, "to prove an actionable claim for negligence, the plaintiff must show (1) the existence of a duty to the complaining party, (2) a breach of that duty, (3) a resulting injury, and (4) that the breach was the proximate cause of the injury." *Id.* at 495. "A breach of a duty imposed by statute, ordinance, or administrative rule shall not be considered negligence per se, but may be considered by the trier of fact as evidence of negligence[.]" RCW 5.40.050. National Union contends that Puget Power breached its duties to furnish "safe, adequate and efficient" electric services, RCW 80.28.010(2), and to "maintain its plant and system in such condition as will enable it to furnish adequate service" and "endeavor to avoid interruptions of service," WAC 480-100-076, proximately causing Boeing's service interruption damages.

In support of its motion for summary judgment dismissal of National Union's complaint, Puget Power presented an affidavit from Jerry L. Henry, Puget Power's Vice President of Engineering and Operating Services, to establish the absence of a material fact for trial. Henry stated that "Puget Power's practices, including its construction, maintenance, and storm-related practices are as good, if not better, than those of most other providers in the industry." Clerk's Paper's at 40 (Henry Aff. ¶ 12). Henry also stated that the windstorm's severity interrupted electric service at Boeing's Renton plant even though it is served by multiple backup lines. (Henry Aff. ¶¶ 10-11). According to Henry, the only way to ensure that windstorms of that magnitude do not interrupt electric service is to bury the

lines underground at a cost of 10 to 15 times above-ground transmission. (Henry Aff. ¶ 16) And "[b]ecause storms of this magnitude occur so infrequently, Puget Power does not believe that customers want to incur costs of this magnitude to install an underground system." *Id.* (Henry Aff. ¶ 16).

In response, National Union presented an affidavit from William A. Thue, an engineering consultant with experience in the electric utilities industry. Thue stated that at the time of the Inauguration Day Storm, Puget Power maintained a generator facility, the Shuffleton Steam Plant, immediately adjacent to Boeing's Renton plant. (Thue Aff. ¶ 7). According to Thue, the Shuffleton plant had the capacity to serve Boeing's Renton plant's electric service needs during the windstorm-related service interruption and was interconnected to Boeing's Renton plant via a substation. (Thue Aff. ¶ 7). Thue also stated that Puget Power lists the Shuffleton plant as a fixed asset for regulatory purposes, meaning that the plant is an available and working source of electric power. (Thue Aff. ¶ 6). In addition to Thue's affidavit, National Union presented evidence that Puget Power had represented the Shuffleton plant as "a cold standby, electric generating facility which is primarily used during peak load operating and emergencies, and equipment outages, and to maintain reliability of service during adverse water or weather conditions." Clerk's Papers at 121 (Letter from Puget Power to Puget Sound Air Pollution Control Agency 1 (Nov. 15, 1979)).[2]

In support of its reply brief, Puget Power presented an

---

[2]National Union also presented evidence regarding Puget Power's general maintenance practices. But, as discussed above, Puget Power's general maintenance practices are not the basis for National Union's negligence claims. Therefore, for purpose of summary judgment, Puget Power's general maintenance practices are not material. *See Ottis Holwegner Trucking v. Moser,* 72 Wn. App. 114, 118, 863 P.2d 609 (1993) ("A material fact is one upon which the outcome of the litigation depends."). And—notwithstanding the trial court's rulings on the parties' motions to strike various statements regarding Puget Power's general maintenance practices—we have not considered these statements for purposes of reviewing the trial court's summary judgment order. CR 56(c). Accordingly, we find it unnecessary to reach the parties' various contentions regarding the trial court's rulings on the motions to strike, except as specifically addressed in the body of this opinion.

affidavit from Donald E. Fleisher, a Puget Power employee, who worked at the Shuffleton plant from 1966 until 1992. (Fleisher Aff. ¶ 1). Fleisher stated that the Shuffleton plant houses steam generators that must be kept in a partially disassembled condition when not in use. (Fleisher Aff. ¶ 2). According to Fleisher, because it takes four days to reassemble and start up the generators, the Shuffleton plant could not have provided Boeing power during the service interruptions that resulted from the Inauguration Day Storm of January 20, 1993. (Fleisher Aff. ¶ 4).

National Union moved to strike Fleisher's affidavit because Fleisher, who did not work at the Shuffleton plant at the time of the Inauguration Day Storm, lacked personal knowledge about the amount of time it would have taken to start up the Shuffleton generators. In its cross-appeal, Puget Power contends that the trial court erred in granting the motion, because National Union "did not submit evidence indicating that Fleisher did not still have knowledge about the Shuffleton operations, notwithstanding his transfer to another facility in 1992, or that the Shuffleton plant was modified in any way after Mr. Fleisher was transferred." Resp't's Br. at 42. But the burden is on the affiant to "affirmatively show competence to testify to the matters stated. It is not enough that the affiant be 'aware of' or be 'familiar with' the matter; personal knowledge is required." *Marks v. Benson*, 62 Wn. App. 178, 182, 813 P.2d 180 (1991). Fleisher states nothing in his affidavit that indicates he had personal knowledge regarding the start-up procedures at the Shuffleton plant after he was transferred to another facility. Therefore, the trial court did not err in striking Fleisher's affidavit.

As discussed above, National Union presented evidence that at the time of the Inauguration Day Storm, Puget Power maintained the Shuffleton plant as a backup generator facility. The Shuffleton plant was located immediately adjacent to and was interconnected with Boeing's Renton plant, and had the capacity to provide Boeing's Renton plant's electric service needs during the

windstorm-related service interruption. National Union also presented evidence from which a reasonable inference could be drawn that the Shuffleton plant was available to provide Boeing with electric service during the windstorm-related service interruption. Puget Power, on the other hand, does not present any admissible evidence to explain why it did not use the Shuffleton plant to provide Boeing with electric service. Therefore, viewing the admitted evidence in a light most favorable to National Union, Puget Power's unexplained failure to use the Shuffleton plant to supply Boeing with electric service raises a genuine issue of material fact for trial regarding Puget Power's alleged negligence. Indeed, if National Union can prove at trial that Puget Power could have and reasonably should have used the Shuffleton plant to supply Boeing with that alternate means of electric service while the regular equipment was being repaired, then at least some portion of Boeing's business interruption losses would appear to have resulted from Puget Power's negligence rather than from the storm itself.

## CONCLUSION

Puget Power's continuity-of-service tariff does not absolve it from liability its allegedly negligent failure to utilize the Shuffleton plant to provide power to Boeing while storm damage to its regular equipment was being repaired. And viewing the admitted evidence in the light most favorable to National Union, Puget Power's unexplained failure to use the Shuffleton plant to supply Boeing with electric service—the only factual basis upon which National Union seeks reversal of the trial court's summary judgment order—raises a genuine issue of material fact for trial regarding Puget Power's alleged negligence. Accordingly, we reverse and remand for trial on the sole factual issue of whether Puget Power negligently failed to use the Shuffleton plant to supply Boeing with interim electric service, thereby proximately causing business interruption losses to Boeing.

AGID, J., concurs.

BECKER, J. (dissenting) — I respectfully dissent from the majority's holding that Puget Sound Power & Light must stand trial for failing to fire up the generator at the Shuffleton plant in anticipation of the Inauguration Day storm. I would hold that National Union Insurance Company did not establish duty in its response to Puget Power's motion for summary judgment.

National Union relies on RCW 80.04.440, which states that a public service company is liable for any loss caused by the company's failure to do "any act, matter or thing required to be done . . . by any order or rule of the commission." The administrative regulation on which National Union relies provides in part that "each utility shall endeavor to avoid interruptions of service, and, when such interruptions occur, to reestablish service with a minimum of delay." WAC 480-100-076. The majority concludes that the regulation makes Puget Power responsible for damages suffered by customers after a storm-caused power outage if a jury finds the company did not reestablish service with a minimum of delay. Majority at 174. I disagree.

WAC 480-100-076, entitled "Service responsibilities," covers a utility company's liability during scheduled interruptions, not during natural disasters or other interruptions beyond the company's control:

> Interruptions of service—each utility shall endeavor to avoid interruptions of service, and, when such interruptions occur, to reestablish service with a minimum of delay.
>
> *When it is necessary for a utility to make repairs to or change its facilities the utility may, without incurring any liability therefor, interrupt service for such periods as may be reasonably necessary*, and in such manner as to minimize the inconvenience to customers, provided that, *when practicable, such interruption shall be during working hours regularly maintained by the utility*. Police and fire departments affected by the interruption shall be individually notified. *All customers affected by a scheduled interruption shall be given notification,*

through newspapers, radio announcements or other means, at least one day in advance.

WAC 480-100-076 (emphasis added).

Provisions in a statute are read in context of the statute as a whole. *Pope v. University of Wash.*, 121 Wn.2d 479, 489, 852 P.2d 1055, *cert. denied*, 510 U.S. 1115, 114 S. Ct. 1061 (1993). Read in context, the regulation relied on does not impose upon Puget Power any specific duty with respect to the reestablishment of service after a natural disaster.[3]

Precluding Puget Power's liability here is consistent with the language of the tariff enacted by Washington Utilities and Transportation Commission, providing that "Neither the Company nor any other person or entity shall have any liability to any Customer . . . for any interruption . . . in service for any loss or damage caused thereby if [it] results from any of the following: . . . Causes beyond the Company's reasonable control including, but not limited to, fire, flood, drought, winds, acts of the elements."

If Puget Power's failure to start the backup generator can be found to breach a duty imposed by WAC 480-100--076, then the reach of the regulation cannot be confined as the majority indicates. Significantly broadened exposure to liability will be the result. In the present case, for example, power from Shuffleton presumably could have been delivered to every customer of Puget Power, and therefore any customer who suffered power loss damage in the Inauguration Day storm could have been a plaintiff along with Boeing. In the future, whenever Washington's weather causes service interruptions, public utility companies will face trials, probably even class actions, to prove that their efforts to reestablish service were done with "a minimum of delay."

I would hold the regulation was not intended to give rise

---

[3]*Cf. Employco Personnel Servs. Inc. v. Seattle*, 117 Wn.2d 606, 614, 817 P.2d 1373 (1991) and *Zamora v. Mobil Oil Corp.*, 104 Wn.2d 199, 209, 704 P.2d 584 (1985) (duty under RCW 80.04.040 arose from violations of statutes specifically requiring, respectively, the marking of underground utilities and the odorization of gas).

to an actionable duty under RCW 80.04.440, and would affirm the superior court's order dismissing National Union's claim against Puget Power.

Review denied at 138 Wn.2d 1010 (1999).